**LEESONA CORPORATION, Plaintiff,**

v.

**VARTA BATTERIES, INC., Defendant.**

**No. 79 Civ. 5874(RJW).**

United States District Court,
S. D. New York.

Sept. 8, 1981.

Alfred W. Breiner, Arlington, Va., for plaintiff; Theodore A. Breiner, B. W. Norton, Arlington, Va., of counsel.

Weiser, Stapler & Spivak and Dechert, Price & Rhodes, Philadelphia, Pa., for defendant; Gerard J. Weiser, Alfred Stapler, Robert C. Heim, Philadelphia, Pa., of counsel.

## OPINION

ROBERT J. WARD, District Judge.

This is a patent infringement action brought by plaintiff Leesona Corporation ("Leesona"), a Massachusetts corporation and the owner of the two patents in issue,[1] against defendant Varta Batteries, Inc. ("Varta"), a New York corporation and the American seller of the accused device.[2] The patents are directed to electrochemical cells using specific electrode structures. The Varta product on which plaintiff bases this infringement action is a 1.4-volt zinc-air battery used to power hearing aids. It is known as the "Premium Plus TYP 4600 1.4V" battery, and because of its size and shape (the diameter of a shirt button and about twice as thick) the Varta battery, and others like it, is often called a "button cell." The matter was tried to the Court sitting without a jury.

The Leesona patents in issue currently are under exclusive license to Gould Inc.,[3] which in turn has a nonexclusive sublicense with Berec Group, Ltd., covering the same patents.[4] The two patents on which this litigation centers were issued by the United States Patent Office to Glenn V. Elmore and Howard A. Tanner and to Anthony M.

Moos. The Elmore and Tanner invention, No. 3,419,900 ("the '900 patent"), was patented on December 31, 1968. The '900 patent issued on an application filed December 22, 1966 (Serial No. 609,985), which was a continuation-in-part of an initial application filed March 4, 1960 (Serial No. 12,758), and a continuation application filed December 23, 1963 (Serial No. 332,812).[5] The Moos invention, No. 3,276,909 ("the '909 patent"), was patented on October 4, 1966, pursuant to an application filed April 6, 1961 (Serial No. 101,057).[6]

In its answer, Varta, denying infringement, claims as affirmative defenses that, on the various grounds addressed further in this opinion, the pertinent claims of the '900 and '909 patents are invalid and unenforceable. Varta also asserts four counterclaims against Leesona. The first counterclaim seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the patents are invalid.[7] The third counterclaim alleges that Leesona engaged in certain acts of unfair competition in violation of section 43(a) of the Lanham Act, as amended, 15 U.S.C. § 1125(a).[8] In its second[9] and fourth[10] counterclaims, Varta seeks relief for alleged violations of federal and state antitrust laws. The federal antitrust counterclaim alleges violations of sections 1 and 2 of the Sherman Act, as amended, 15 U.S.C. §§ 1–2, and sections 1, 2, 3, 4 and 16 of the Clayton Act, as amended, 15 U.S.C. §§ 12, 13, 14, 15 & 26. The state antitrust counterclaim asserts that plaintiff's actions constitute a violation of New York's antimonopoly provisions, N.Y.Gen.Bus.Law art. 22. In a fifth and final counterclaim, Varta

---

1. Pretrial Order stipulation, ¶¶ I(A)(1), (B)(1)–(2).

2. *Id.*, ¶ I(A)(2); Varta Answer, ¶ 6. Varta is the wholly owned United States subsidiary of Varta Batterie Aktiengesellschaft ("Varta A.G."), a West German corporation. Pretrial Order stipulation, ¶¶ I(A)(3)–(4). Although Varta A.G. is not a party to this action, in lieu of being joined as a party defendant, the parent corporation agreed to be bound by the judgment in this action. Stipulation filed March 6, 1980.

3. Defendant's exhibit 208.

4. Defendant's exhibit 209; Zies deposition, p. 11.

5. The '900 patent was received as plaintiff's exhibit 1.

6. The '909 patent was received as plaintiff's exhibit 2.

7. Answer, ¶¶ 26–33.

8. *Id.*, ¶¶ 40–45.

9. *Id.*, ¶¶ 34–39.

10. *Id.*, ¶¶ 46–47.

alleges acts of unfair competition under New York state law.[11]

Prior to trial the Court severed and stayed defendant's antitrust counterclaims and stayed plaintiff's claim for damages, to be litigated after the issues of patent validity and infringement were determined. Because of their close relation to Varta's affirmative defenses, the patent-invalidity and federal and state unfair-competition counterclaims [12] remained. At trial, at the close of defendant's case, Leesona moved to dismiss Varta's unfair-competition counterclaims. Conceding that it had not offered sufficient evidence in support of these counterclaims, defendant did not oppose the motion and Varta's unfair-competition counterclaims were dismissed.[13] Thus, remaining for decision at this time are the questions of patent infringement and patent validity for the '900 and '909 patents.

For the reasons that follow, the Court finds that the relevant claims of both patents are valid, enforceable, and infringed by the Varta battery.

## A. BACKGROUND

### 1. Preliminary Injunction

■ Shortly after filing the complaint, plaintiff moved for a preliminary injunction to enjoin defendant from selling its allegedly infringing product. At oral argument on this application, held on January 9, 1980, the Court determined that the record before it was not sufficient to enable a decision on the preliminary injunction motion and that an evidentiary hearing was essential. See *Dopp v. Franklin National Bank*, 461 F.2d 873, 879 (2d Cir. 1972) (evidentiary hearing essential to resolve disputed facts on application for preliminary injunction). However, because the parties were not prepared to proceed directly to such a hearing, with the parties' consent the Court directed that pursuant to Rule 65(a)(2), Fed.R.Civ.P., the trial of the infringement action on the merits—which has now been held—be advanced and consolidated with the evidentiary hearing on the motion for a preliminary injunction.[14] Accordingly, the decision addresses the question of final injunctive relief, and the motion for a preliminary injunction is denied as moot.[15]

### 2. Court Expert

At the same time it ordered that the preliminary injunction application be consolidated with the full trial on the merits, the Court further directed that a court expert be appointed pursuant to Rule 706, Fed.R.Evid., and requested the parties to

11. *Id.*, ¶¶ 46 & 48.

12. Varta's first, second, and fifth counterclaims.

13. Trial transcript, p. 767 [hereinafter, *e. g.*, "Tr. 767"].

14. Advancement and consolidation under Rule 65(a)(2) may, as matter of discretion, be ordered by a district court on its own motion. See *Singleton v. Anson County Board of Education*, 387 F.2d 349 (4th Cir. 1967) (per curiam); *Brass v. Hoberman*, 295 F.Supp. 358, 364–65 (S.D.N.Y.1968); and 7 Moore's Federal Practice ¶ 65.04[4], at 65–65 (2d ed. 1980). It is only necessary that, as here, the parties be "alert[ed] . . . that the hearing is to be the final determination of the action" sufficiently in advance of trial to prepare. *Galella v. Onassis*, 487 F.2d 986, 997 (2d Cir. 1973).

15. Actually, a preliminary injunction was in effect for the approximately seven months preceding the completion of trial. The preliminary injunction issued on September 5, 1980, pursuant to a consent order signed by both parties

(order filed Sept. 12, 1980). At a pre-trial conference on August 21, 1980, the Court, in an effort to move this matter to an early trial, set a trial date of September 3, 1980. When defendant demurred, the Court offered as an alternative that a hearing on the motion for a preliminary injunction commence the following week. Defendant objected to these choices on the ground that they provided insufficient time for it to prepare either for trial or for a preliminary injunction hearing. Although aware of Varta's difficulties, the Court was constrained to adhere to this schedule to afford some protection to the interests of Leesona, which had consented to a Rule 65(a)(2) consolidation and whose application for preliminary injunctive relief had been pending for over nine months. Rather than proceed to trial or a hearing on the dates set by the Court, defendant, on its own behalf and on behalf of Varta A.G., offered to consent to the preliminary injunctive relief plaintiff sought. Leesona accepted the offer and the consent preliminary injunction order issued. Varta was then offered the opportunity to conduct additional discovery and other trial preparation. The preliminary injunction expired by

submit nominations.[16] The name of one individual, Elton J. Cairns, Ph.D., appeared on both parties' lists of nominees. Both sides agreed that Dr. Cairns, a professor of chemical engineering at the University of California, Berkeley, is an expert in the field of electrochemistry. There was no dispute that he is fully qualified to give expert testimony and render an opinion on the technical questions at issue in this litigation.

After learning that Dr. Cairns was acceptable to both parties as a court expert, the Court communicated with him by telephone. Before he would agree to serve, Dr. Cairns requested an opportunity to review

some background materials on the case and the technical questions presented. The Court then mailed him a package of documents that included a summary of each side's position (prepared by Leesona and Varta independently and submitted to the Court), a copy of each of the patents in issue and copies of other relevant patents, and certain other analytical information and literature references. After reviewing these materials Dr. Cairns agreed to serve, and pursuant to Rule 706(a) the Court entered a consent order designating him as a court-appointed expert.[17]

Shortly thereafter, at the Court's request the parties prepared the technical questions

---

the terms of the consent order on "the date of the conclusion of the taking of evidence at trial."

**16.** Rule 706 provides:

(a) Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless he consents to act. A witness so appointed shall be informed of his duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the court or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

(b) Compensation. Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow. The compensation thus fixed is payable from funds which may be provided by law in criminal cases and civil actions and proceedings involving just compensation under the fifth amendment. In other civil actions and proceedings the compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs.

(c) Disclosure of appointment. In the exercise of its discretion, the court may authorize

disclosure to the jury of the fact that the court appointed the expert witness.

(d) Parties' experts of own selection. Nothing in this rule limits the parties in calling expert witnesses of their own selection.

**17.** The order, signed March 26, 1980, and filed on March 28, 1980, detailed Dr. Cairns duties as follows:

I. In advance of trial Dr. Cairns is to prepare himself to become adequately knowledgeable to serve as a consultant to the Court with respect to the technical or scientific aspects of this litigation, said preparation shall include, but not be limited to a review of the following:

(1) The disclosure and teaching of U.S. Patent Nos. 3,419,900 (Elmore '900) and 3,276,909 (Moos '909).

(2) The prior art cited by the United States Patent Office in the proceedings of the Elmore '900 patent.

(3) The prior art cited by the United States Patent Office in the proceedings of the Moos '909 patent.

(4) Other patents, patent applications, and publications relied upon by the parties (see updated exhibit list).

II. To attend the trial during the testimony of witnesses relating to the technical or scientific aspects of the case so as to permit fulfillment of the duties of I above.

III. To offer testimony at trial subsequent to the completion of the parties' cases as a Court expert on any technical or scientific subject requested by the Court on direct examination by the Court, subject to cross-examination by counsel for the parties.

they wished to have Dr. Cairns consider. The Court forwarded these questions to the expert.[18] Dr. Cairns addressed the parties' questions in a preliminary report dated July 29, 1980,[19] which he submitted to the Court and copies of which the Court in turn furnished to counsel. The court expert was then examined on oral deposition in two three-day sessions, conducted by counsel without direct supervision by the Court.[20] Dr. Cairns did not prepare a final written report subsequent to the July 29th preliminary report, but rather gave his final views, as discussed in detail below, in his oral testimony at trial after he had heard the testimony of the experts called by Leesona and Varta.

The Court found Dr. Cairns' testimony to be of enormous assistance. Not only was the court expert's evaluation and testimony thorough and careful, but he also explained his views with a patience and clarity that any court trying a scientifically difficult patent case would find invaluable. The parties' expert witnesses, as a reading of this opinion should reveal, also were quite helpful. Indeed, without their testimony the value of Dr. Cairns' services, as well as the Court's understanding of the technical issues, would have been severely diminished. But, in an action such as this, a court expert serves not only as a witness on whose opinion the Court can rely for assistance, but also as both a second set of ears

for the court and a teacher who, unaffected by his having been called as a witness by one side or the other, can explain the technical significance of the evidence presented.

Naturally a court will rely heavily on and give great weight to the testimony of its own expert, especially as able an expert as Dr. Cairns. Nevertheless, although a scientifically difficult patent case such as this is ideally suited to the appointment of a court expert pursuant to Rule 706, the appointment of such an expert does not remove from the trial court's shoulders the burden of understanding and becoming fully familiar with the technical questions in the case. The court expert serves to enhance the trial court's understanding, but it is the court, and not its expert, that decides the case. Thus, a court appointing a Rule 706 expert must be careful to remind counsel, particularly at the time of the court-appointed expert's deposition, that the case is not to be tried to the court expert. Fortunately for this Court, counsel here well understood the court expert's proper role, and their cooperation and assistance throughout this litigation enabled the Court to get the most benefit out of its decision to appoint Dr. Cairns.[21]

### 3. The Parties' Witnesses at Trial

At trial, on its case-in-chief, plaintiff called two witnesses, Galen R. Frysinger,

---

18. The parties were not permitted to communicate directly with Dr. Cairns. All communication with the court expert was done through the Court, and copies of all materials sent by the Court to Dr. Cairns were docketed by the clerk and placed in the court file.

19. Plaintiff's exhibit 21.

20. Prior to each deposition session, however, the Court conferred with counsel and set the ground rules for Dr. Cairns' examination.

21. Fed.R.Evid. 706(b) provides that a court-appointed expert's "compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs." Dr. Cairns, who was compensated at his customary consulting rate, has been paid in equal shares by plaintiff and defendant. He was first compensated for his time through the completion of his preliminary report and then for his services

after the completion of the report up through and including his testimony at trial. Although the Court is of the view that all of the costs incident to the retaining of a court expert may be assessed as a taxable cost, see 11 Moore's Federal Practice § 706.20, at VII–86 (2d ed. 1976), the Court has determined not to include Dr. Cairns' compensation in the taxable costs authorized by 28 U.S.C. § 1920. The taxation of costs is a matter committed to the district court's discretion. *United States v. Procario*, 361 F.2d 683, 685 (2d Cir. 1966) (per curiam). In this Court's view, considering the nature of the case and the reason a Rule 706 court expert was appointed, the appointing court may in the interest of justice apportion the cost of the expert in the manner it finds appropriate under the circumstances, regardless of the ultimate victor in the lawsuit. *See* 3 Weinstein's Evidence ¶ 706[03], at 706–22 (1980).

Ph.D., and Jose D. Giner, Ph.D. Both were qualified as expert witnesses in the field of electrochemistry.

Defendant called four live witnesses, two independent expert witnesses in the field of electrochemistry, and two employees of Varta's parent corporation, Varta A.G. Varta's two independent experts were Karl Kordesch, Ph.D., and Paul Stonehart, Ph.D. The two Varta A.G. employees, Wolfgang Kloss and August Winsel, Ph.D., testified on the Varta manufacturing process for defendant's metal-air battery and on the research and development that went into the production of the Varta battery. Dr. Winsel also was qualified as an expert in electrochemistry.

In addition, Varta introduced the oral deposition testimony of four witnesses: Paul P. Johnson, John W. Cretzmeyer, Carl W. Zies Jr., and August J. Hipp. Johnson, now retired, was a high-level executive of Leesona during the period in which the inventions in issue were patented, having become the president of the plaintiff corporation in 1967. Cretzmeyer is a research chemist at Gould, plaintiff's licensee, and Zies is the general manager of Gould's Portable Battery Division. Hipp, also employed by Gould, is a patent lawyer.

The Court called Dr. Cairns as its expert witness.

## B. THE PATENTS AND CLAIMS IN SUIT

### 1. *In General*

The patents that are the subject matter of this case are directed to electrochemical devices used in the production of energy, commonly known as batteries and also referred to as electrochemical cells and fuel cells.[22] The energy is produced by these devices through the chemical process known as the oxidation-reduction reaction. Ener-

gy generation results from the current flow between the oxidized reactant, which loses electrons, and the reduced reactant, which in turn gains electrons. The oxidation and reduction reactions occur at sites known as electrodes. In an electrochemical cell, current is produced in an external circuit by the electron flow from the electrode at which oxidation occurs (where electrons are lost) to the electrode at which the reactant is reduced (and where electrons are gained).

A liquid or paste-like substance, the electrolyte, conducts current within the cell by carrying to the electrodes the positively and negatively charged ions created by the oxidation and reduction reactions. The fuel cell or battery must, of course, be able to contain the electrolyte. Thus, the electrochemical cell must be constructed in such a way that the electrolyte does not escape or leak out of the electrochemical cell package.

The reactants fuel the oxidation and reduction reactions that create the electrochemical cell's energy, and are consumed in the reactions. In metal-air batteries, for example, such as the Varta battery in this case, the oxidized and reduced reactants are a metal (e. g., zinc) and a gas from the air (e. g., oxygen). The metal-air battery contains the metal fuel in the battery package, but the gas is drawn from the air. Although both the metal and the gas are "consumed" in the electrochemical reactions—that is, they undergo a change in chemical form—the gas drawn from the air at the gas electrode is essentially in infinite supply and thus this electrode is said to be nonconsumable. On the other hand, the metal reactant at the metal electrode is contained in the battery itself and truly is consumed (that is, used up) in the chemical reactions.

Electrochemical cells of the type at issue here also contain substances used to enhance or speed up the chemical reactions.

22. The significance of the term "fuel cell" as distinguished from "battery" or the more general term "electrochemical cell," particularly with regard to the '909 patent, is discussed later in this opinion. Part D(2) *infra.* The Court will use the terms interchangeably except where specific reference is made otherwise. It is sufficient to note at this point that there is less than universal agreement on the precise technical meaning of the term "fuel cell." *See, e. g.,* Kordesch testimony, Tr. 334–38 [hereinafter, *e. g.,* "Kordesch Tr. 334–38"], and Cairns Tr. 553–54. *See also* note 63 *infra.*

These substances are known as catalytic or, more particularly, electrocatalytic materials. On the issue of infringement in this case, it is the comparison of the Varta electrocatalyst with that disclosed in the Elmore and Tanner patent that presents the Court with the closest and most difficult question.

Thus, the kind of electrochemical cell that is the subject matter of this lawsuit contains as its essential components two electrodes at which two fuel reactants are supplied, an electrolyte (and a means to contain it), and an electrocatalyst. In addition, at one or both of the electrodes externally supplied gas is the fuel reactant, and the electrode is nonconsumable.

### 2. Elmore and Tanner No. 3,419,900

■ In this action, plaintiff contends that the Varta metal-air battery infringes claim 4 of the '900 patent.[23] In claim 4 Elmore and Tanner describe an electrochemical cell for the direct generation of electrical energy consisting of two electrodes,[24] an electrolyte in the space between them, and an electrocatalyst. The claim specifies that at least one of the electrodes

be a nonconsumable gas electrode that consists of a "catalytic layer." This electrocatalytic layer is described as a "substantially uniform" mixture of "metal containing electrocatalyst particles and a fluorocarbon polymer." Claim 4 further specifies that the catalytic layer be exposed to the cell's electrolyte and be sufficiently porous to permit the diffusion of gases into it.

The electrocatalyst particles in the catalytic layer of the described electrode serve to catalyze the reactions in the cell. The catalytic layer is exposed on one side to the electrolyte and on the other to the reactant gas. The layer is exposed to the electrolyte so that the electrocatalyst particles can be "wetted" or "flooded" by the electrolyte. It is exposed to the gas so the gas reactant can pass into the porous catalytic layer and to the reactive sites, at the electrolyte-catalytic layer interface.[25]

Assuming validity over prior art, there is no dispute that the inventive feature of the Elmore and Tanner electrode structure is the use of a fluorocarbon polymer mixed with the electrocatalyst particles.[26] The use of the fluorocarbon polymer, a hydrophobic substance, in the mixture that con-

---

**23.** Claim 4 describes the following invention:
 An electrochemical cell for the direct generation of electrical energy comprising an anode, a cathode, and an electrolyte, said electrochemical cell being constructed and arranged to provide a space between said anode and cathode and said space containing said electrolyte, at least one of said anode and cathode being a non-consumable, gas-consuming electrode comprising a catalytic layer containing a substantially uniform admixture of metal containing electrocatalyst particles and a fluorocarbon polymer, said catalytic layer being exposed to the electrolyte of the cell and having a porosity sufficient to permit diffusion of gases into said catalytic layer.
Plaintiff's exhibit 1, col. 7, line 54 to col. 8, line 5.
Although the '900 patent asserts a total of sixteen claims, the patent contains only four independent claims. The other twelve, claims 5–16, refer back to and are dependent upon claim 4. With the exception of claim 7 (the fluorocarbon polymer is polytetrafluoroethylene) and the possible exception of claim 8 (the electrocatalyst is silver), these twelve dependent claims concededly are not infringed by the Varta battery. Although a dependent claim

may not be infringed unless the claim on which it depends is infringed, *Autogiro Co. of America v. United States*, 384 F.2d 391, 408 (Ct.Cl. 1967), an independent claim may of course be infringed without there being an infringement of a dependent claim.

**24.** The claim refers to the electrodes as anode and cathode. *See* note 23 *supra*. The anode in an electrolytic cell is the positively charged electrode toward which current flows. In a battery that is the source of current, it is the negative electrode or terminal. Conversely, the cathode is the negatively charged electrode from which current flows and in a battery is the positive terminal. In the Varta zinc-oxygen metal-air battery, for example, the zinc electrode is the anode and the oxygen electrode is the cathode. For ease of reference, however, the Court will refer to the anode and cathode as electrodes and, where it is necessary to be more specific, as, *e. g.*, the gas electrode or the metal electrode, rather than as anode and cathode.

**25.** Frysinger Tr. 34.

**26.** *Id.* Tr. 35; Cairns Tr. 589.

stitutes the Elmore and Tanner catalytic layer, or active mass, creates continuous pathways in the active mass through which the gas reactant can diffuse to pass to the reactive sites. This enables the electrochemical reactions to occur throughout the entire volume of the porous active mass, rather than at the surface of the catalytic layer as would occur if the hydrophobic polymer were not part of the catalytic mixture.[27] As Dr. Cairns described it, the use of the hydrophobic fluorocarbon polymer allows the three phases of the reaction—the solid electrocatalyst particles, the liquid electrolyte, and the reactant gas—to coexist and interact at reaction sites throughout the catalytic layer.[28] An electrochemical cell in which the oxidation and reduction reactions occur through the volume of the catalytic layer, such as the '900 patent describes, is more efficient than a cell in which the reactions can take place only at the surface.[29]

The preferable fluorocarbon polymer disclosed in the '900 patent is polytetrafluoroethylene ("PTFE"),[30] familiarly known under the Du Pont tradename "Teflon." PTFE is the fluorocarbon polymer used in the active masses of the gas electrodes both in the Varta battery[31] and in the metal-air battery manufactured by Gould, plaintiff's licensee.[32] The mixing of the PTFE and the

catalytic material to produce the electrode described in the '900 patent results in a bonding of catalyst particles by the PTFE, and the electrode frequently is referred to as PTFE-bonded or Teflon-bonded. Thus, the PTFE in the Elmore and Tanner electrode serves both as a wetting-control agent and as a binding agent.[33]

The catalytic layer described in claim 4 consists of "a substantially uniform admixture of metal containing electrocatalyst particles and a fluorocarbon polymer." The claim does not specify a minimum or maximum volume or weight proportion for the amount of metal in the "admixture."[34] But there is no question that the language of claim 4 does call for some metal in the catalytic layer.[35] The important and difficult question, as discussed in detail below, part D(2) *infra*, is how much, if any, metal claim 4 should be read to require and whether any metal must be contained in the electrode for claim 4 of the '900 patent to be infringed.

The '900 patent also discloses the use of "porous carbon blocks" in the gas electrode. As Elmore and Tanner describe this use of carbon, by example, the PTFE-metal mixture is impregnated into the pores of the carbon material.[36] In general, it is now well recognized—and was at the time of the

27. Frysinger Tr. 35–38; Stonehart Tr. 407–08.

28. Cairns Tr. 589–90.

29. *Id.* Tr. 574.

30. Plaintiff's exhibit 1 ('900 patent), col. 6, lines 18–20, and claim 7.

31. Kloss Tr. 205. Varta uses a PTFE material known by its trademark as "Hostaflon." A product of the West German chemical company Hoechst, Hostaflon is the equivalent of Teflon. Stonehart Tr. 363–65.

32. Cretzmeyer deposition, vol. I, p. 36.

33. Plaintiff's exhibit 21, pp. 2–3; Cairns Tr. 494–95.

34. An "admixture" is a mixture created by the addition of one substance to another. Webster's New World Dictionary of the American Language 18 (2d college ed. 1972). As used in claim 4 and for the purposes of the decision here, the Court considers this term to mean the

same as its more familiar synonym "mixture" and will use the terms interchangeably.

35. *E. g.*, Frysinger Tr. 62.

36. The '900 patent, plaintiff's exhibit 1, col. 5, lines 49–61, presents this example as follows:

Electrodes formed of porous carbon blocks have been treated in accordance with the invention to provide a water repellent structure within the pores. The oxygen electrode is treated with a metallic silver powder, or the like, mixed with a colloidal Teflon dispersion.... The result is a Teflon dispersion impregnated into the pores of the carbon block, together with the silver powder, or the like, which acts as a catalyst on the oxygen electrode.

In claim 11, the '900 patent claims "[t]he electrochemical cell of claim 7 [claim 4 with PTFE as the fluorocarbon] wherein the electrode includes a porous substrate and said catalytic layer is deposited upon said porous substrate."

Elmore and Tanner patent applications—that carbon can be used in this way as an "extender" or "carrier" of the electrocatalytic material. When the metal catalyst is mixed with or impregnated into the carbon extender, the expensive metal catalyst (such as silver or platinum) is diluted and thus more efficiently used, with the result being greater current generation per unit of metal electrocatalyst.[37] Used in this way, carbon does not function as an electrocatalyst. Plaintiff's licensee Gould uses carbon in the oxygen electrode of its metal-air battery in this manner as a carrier on which the mixture of PTFE and its metal catalyst, manganese, is deposited.[38]

Although the '900 patent unquestionably discloses the use of carbon as an extender or carrier, the question remains whether the use of electrochemically enhanced carbon as a catalyst (rather than in an inert form as an extender), either alone or in combination with a small amount of metal catalyst, is covered by the Elmore and Tanner patent. This is a question that the Court addresses in detail in its discussion of infringement below.

### 3. Moos No. 3,276,909

Plaintiff maintains that the Varta battery infringes claim 9 of the '909 patent. Claim 9 is an independent claim, and there are no dependent claims directed to it. In general, the Moos patent discloses the use of porous "plastic sheets or films" as an inexpensive means of controlling the gas-electrolyte-electrocatalyst interface at which the current-generating reactions in an electrochemical cell occur.[39] The porous plastic films, which can be constructed of any polymeric material, either hydrophobic or hydrophilic, are used to support the catalyst and any catalyst extender material (such as carbon) in the electrode and are in direct contact with the catalytic material.[40] Fluorinated hydrocarbons are disclosed as among the acceptable polymers for such a film.[41] PTFE, a fluorinated hydrocarbon polymer, is disclosed as an acceptable polymer membrane material.[42]

Claim 9 discloses a "fuel cell"[43] with, as in the basic electrochemical cell described above, two electrodes, an electrolyte and an electrocatalyst, and specifically with at least one of the electrodes supported by "a porous hydrophobic polymer matrix."[44] Claim 9 prescribes as the electrocatalyst "a porous conductive catalytically activating metal layer," which is to be in direct contact with the polymer matrix on one side. On its other side the catalytic layer is to be in direct contact with the electrolyte, and the side of the polymer matrix not in contact with the catalyst is, of course, to be oriented toward the gas. Thus, in a metal-air battery employing the Moos electrode structure of claim 9, the air or oxygen electrode would consist of a porous metal

---

**37.** Kordesch Tr. 312–17.

**38.** Cretzmeyer deposition, Vol. I, p. 59.

**39.** Plaintiff's exhibit 2 (the '909 patent), col. 1, lines 10–18 & 53–55.

**40.** Id., col. 2, lines 8–14. Moos describes the use of his porous films with the electrocatalytic material as follows:

The catalytically active materials are formed onto the porous plastic structure either as thin films of the pure elements, alloys or oxides thereof, or they can be applied to suitable supports such as carbon black or alumina which enhances their catalytic activity, and the support structure brought in intimate contact with the porous plastic.

**41.** Id., col. 2, lines 20–21.

**42.** Id., col. 7, line 17.

**43.** This significance of this term is discussed elsewhere. See note 22 supra and note 63 infra.

**44.** In full text, Moos in claim 9 claims:

A fuel cell for the generation of electrical energy directly from a fuel and oxidant comprising an electrolyte, at least one oxidizing electrode, at least one fuel electrode, said electrodes being in contact with said electrolyte, and means for providing fuel cell reactants to said electrodes, ate [sic] least one of said electrodes comprising a porous hydrophobic polymer matrix having a porous conductive catalytically activating metal layer in intimate contact with one surface, the said catalytically activating metal layer being in contact with the electrolyte of the fuel cell. Plaintiff's exhibit 2, col. 8, lines 31–40.

electrocatalyst backed with (*i. e.*, bonded to) a matrix, or film or membrane,[45] of porous hydrophobic polymer material. The polymer side of this membrane-backed electrode is exposed to and faces the atmosphere, and the electrocatalyst side is exposed to the electrolyte. The electrolyte in turn is of course in contact with the metal electrode of the battery.[46]

The particular advantage of Moos' hydrophobic polymer membrane is in the control of the electrolyte. The membrane disclosed in claim 9 is sufficiently porous to permit gas to diffuse into the electrode but, because of its hydrophobic property, is not permeable to a liquid electrolyte. Thus, the electrolyte can freely wet the electrocatalyst yet not enter the gas "space" on the outside of the electrode.[47] The use of a hydrophobic polymer electrode backing prevents the liquid electrolyte from escaping from the electrochemical cell by leaking through the electrode. As the court expert explained, a PTFE or other polymer backing prevents "the so-called weeping of electrolyte through the structure."[48]

### 4. *Combined Use of the '900 and '909 Inventions*

Together, claim 4 of the Elmore and Tanner patent and claim 9 of the Moos invention can be used in an electrochemical cell, such as the Gould metal-air battery, containing a PTFE-bonded, PTFE-backed gas electrode. In Dr. Cairns' view, the '900 and '909 patents represent two steps of advancement in electrochemical cell development. The first step, represented by the Elmore and Tanner invention, is the development of the PTFE-electrocatalyst mixture. The second step, described in the Moos patent, is, in the court expert's opinion, the addition of the PTFE film backing to the PTFE-electrocatalyst mixture.[49] Thus, an electrochemical cell combining the inventive features of the two patents may use PTFE in two separate applications—as the fluorocarbon called for in claim 4 of the '900 patent and as the hydrocarbon polymer in claim 9 of the '909 patent.

Whether the Varta battery, which employs PTFE both in its electrocatalyst mixture and as a backing for the oxygen electrode, infringes the '900 patent or the '909 patent is a question to which the Court turns below. To place the infringement discussion in its proper context, however, the Court first outlines briefly the 1976 Court of Claims decision that involved the patents in suit.

### C. PRIOR ADJUDICATION

In *Leesona Corp. v. United States*, 530 F.2d 896, 208 Ct.Cl. 871 (1976) (per curiam), the Court of Claims affirmed and adopted the trial judge's recommended decision (Cooper, J.), in which the trial court held,

---

**45.** In the '909 patent Moos uses the terms "film," "membrane," "matrix," and "sheet" more or less interchangeably to describe the hydrophobic and hydrophilic electrode-backing material disclosed in the invention. For its purposes here the Court will use the terms synonymously.

**46.** This metal electrode should not be confused with the metal electrocatalyst. The metal electrode in the metal-air battery, it will be recalled, *see* part B(1) *supra*, contains one of the two reactants that fuel and are consumed in the electrochemical cell's reactions (oxygen from the air is the other reactant). Both Varta and Gould, for example, use zinc as the metal reactant in their batteries. The metal electrocatalyst, part of the oxygen electrode, catalyzes but is not consumed in (or is otherwise a part of) the reactions. Gould, as earlier noted, uses manganese as its metal electrocatalyst. Varta, to the extent it uses a *metal* catalyst at all, *see*

part D(1) *infra*, relies on silver and small amounts of various other metals.

**47.** Frysinger Tr. 47.

**48.** Cairns Tr. 493. Dr. Cairns further testified that:

This name "weeping" is descriptive of the appearance of the surface of the electrode facing the gas side because other electrode structures allow the formation of droplets of water and/or electrolyte on the outer surface of the electrode resulting in the coating of the electrochemically active portions of the electrode, thereby preventing high rates of supply of reactants to the electrochemically active zones and removal of some products from that zone in an expeditious manner. *Id.*

**49.** Cairns Tr. 510.

*inter alia*, that claims 4 and 7 of the '900 patent and claim 9 of the '909 patent were valid and infringed by the United States Government's metal-air battery designated as the BB–626 ( )/U ("BB–626"). In addition to drafting a formal opinion on the seven patents involved in *Leesona Corp. v. United States*, the trial judge also prepared forty-two separately numbered paragraphs of detailed findings of fact, the first twenty-three and the last three of which deal either specifically or generally with the '900 and '909 patents.[50]

### 1. *Validity*

■ On the question of validity of the '900 and '909 patents, the prior decision in the Court of Claims is not res judicata as to Varta, since defendant was not a party to that action. *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 873 (2d Cir. 1971), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973). Similarly, since it was the United States, and not Varta, that lost on the claim of invalidity, no collateral estoppel effect can be accorded to the earlier decision and used against Varta and to the benefit of Leeso-

na. *Champion Spark Plug Co. v. Gyromat Corp.*, 603 F.2d 361, 367 & n.12 (2d Cir. 1979) (dictum), *cert. denied*, 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980).[51] Moreover, the decision by the Court of Claims is not controlling on this Court as a matter of stare decisis. *Id.; Jamesbury Corp. v. Litton Industrial Products, Inc.*, 586 F.2d 917, 920 (2d Cir. 1978), *cert. denied*, 440 U.S. 961, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979).

■ Nevertheless, the prior decision upholding the patents substantially strengthens the statutory presumption, 35 U.S.C. § 282, that arises out of the Patent Office's determination of validity, *Illinois Tool Works, Inc. v. Foster Grant Co.*, 547 F.2d 1300, 1303 (7th Cir. 1976), *cert. denied*, 431 U.S. 929, 97 S.Ct. 2631, 53 L.Ed.2d 243 (1977), at least as to those questions litigated in the prior action.[52] For this reason, the Court directed Varta to concentrate its efforts on the validity question, as defendant has done, to matters defendant believed were not presented to the Court of Claims or not expressly considered in the earlier decision.[53] Of course, since patent validity

**50.** The trial judge's opinion is published with the Court of Claims per curiam opinion at 530 F.2d 896. His findings of fact, however, appear (with the opinions) only in the Court of Claims Reporter, 208 Ct.Cl. 871, 897–925. Accordingly, although the slip opinion in *Leesona Corp. v. United States* was received as plaintiff's exhibit 20, in referring to this prior adjudication the Court will cite to 530 F.2d and 208 Ct.Cl. for the trial judge's opinion and to 208 Ct.Cl. for the judge's findings of fact.

The decision in *Leesona Corp. v. United States*, *supra*, considered questions of patent infringement and validity only. Subsequently, in *Leesona Corp. v. United States*, 599 F.2d 958 (Ct. Cl.) (en banc), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979), the Court of Claims determined the amount of damages to be awarded Leesona for the patent infringements found in the earlier decision. The latter decision is of no concern to the Court here.

**51.** *See also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326–33, 99 S.Ct. 645, 649–52, 58 L.Ed.2d 552 (1979), and *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (collateral estoppel effect against plaintiff in infringement action accorded to earlier decision holding patent invalid).

**52.** To overcome this enhanced presumption of validity courts have required the party claiming invalidity to present "persuasive new evidence" that was not before the prior court demonstrating a "material distinction between" the cases, *Illinois Tool Works, Inc. v. Foster Grant Co.*, *supra*, 547 F.2d at 1302 (quoting *American Photocopy Equipment Co. v. Rovico, Inc.*, 384 F.2d 813, 815–16 (7th Cir. 1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1133 (1968)), or to persuade the later court of "a very palpable error in law or fact." *American Home Products Corp. v. Lockwood Manufacturing Co.*, 483 F.2d 1120, 1125 (6th Cir. 1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 917, 39 L.Ed.2d 110 (1974) (quoting *Cold Metal Process Co. v. Republic Steel Corp.*, 233 F.2d 828, 837 (6th Cir.), *cert. denied*, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956)). As far as the Court can ascertain, however, no such precise formulation has been articulated by the Court of Appeals for the Second Circuit.

**53.** The Court addresses the particular findings and conclusions of the Court of Claims in its discussion of validity, part E *infra*.

is a question of law, *Philip v. Mayer, Roth-kopf Industries, Inc.*, 635 F.2d 1056, 1061 (2d Cir. 1980), Varta may always argue, as it does here, *see* part E(1)(a) *infra*, that the application of the law of the Second Circuit to the factual determinations made by the Court of Claims compels a different result from that reached earlier.

### 2. *Infringement*

On the question of infringement, with the possible exception of providing guidance to this Court on the construction of the claims of the two patents in issue, the Court sees no special importance to the prior adjudication. Accordingly, Leesona's burden of proving infringement by a preponderance of the evidence is not lessened by the Court of Claims decision.

It is safe to say that the factual issues before the Court of Claims on the question of infringement were considerably easier than those presented here. A quick comparison of the United States' BB–626 and the Varta button cell (described in more detail below, part D(1)) makes this clear.

First, as to claim 4 of the '900 patent, the BB–626 battery [54] is an electrochemical cell with one nonconsumable gas electrode consisting of a catalytic layer that is a mixture of a fluorocarbon polymer (Teflon) and a metal (platinum) electrocatalyst. The catalytic layer is porous and is exposed to the electrolyte.[55] Although the Varta battery contains all of the above elements,[56] unlike the BB–626 it does not rely exclusively, if at all, on a metal electrocatalyst.[57] Since claim 4 calls for "a metal containing electrocatalyst particles," it can be argued, as defendant argues, that the gas electrode in Varta's battery falls outside of the language of the claim; the BB–626 unquestionably comes within it.

Second, with respect to claim 9 of the Moos patent, the BB–626 uses an electrode backing of a porous hydrocarbon polymer matrix (Teflon)[58] and, as noted above, a metal (platinum) electrocatalyst. The Varta cell has the same Teflon backing,[59] but again does not necessarily have a "metal" catalyst.[60] Moreover, the BB–626 is closer to a classic "fuel cell" than the Varta battery, and it is easier to conclude that, as the '909 patent specifies, the United States' infringing cell has a "means for providing fuel cell reactants to [the] electrodes."[61] Inasmuch as the BB–626 and the Varta button cell draw oxygen continuously from the atmosphere to provide fuel to the gas electrode, both cells fall within this patent provision as to this electrode. But, unlike the Varta cell, the BB–626 has a mechanically replaceable metal (zinc) electrode; the Varta battery must be disposed of entirely when its metal reactant (also zinc) is fully consumed.[62] Since the term "fuel cell," as classically and most narrowly defined, is an electrochemical cell with fuel reactants continuously fed to both electrodes[63]—or, to

---

**54.** Plaintiff's exhibit 4.

**55.** Frysinger Tr. 57–58; *Leesona Corp. v. United States, supra*, 208 Ct.Cl. at 905, Finding of Fact (hereinafter "F.F.") no. 15. *See* '900 patent, claim 4, note 23 *supra*.

**56.** Frysinger Tr. 57–58. *See also* plaintiff's exhibit 8.

**57.** Kloss Tr. 218–24.

**58.** Frysinger Tr. 57–58; *Leesona Corp. v. United States, supra*, 208 Ct.Cl. at 909, F.F. no. 22.

**59.** Kloss Tr. 213–14.

**60.** Plaintiff's exhibit 2 ('909 patent), claim 9, col. 8, line 39. *See* note 44 *supra*.

**61.** Claim 9 of the Moos patent, *supra* note 44, calls for a "fuel cell for the generation of elec-

trical energy [with] . . . means for providing fuel cell reactants to [the] electrodes." Plaintiff's exhibit 2, col. 8, lines 31–35.

**62.** Kordesch Tr. 338.

**63.** *Id.* Tr. 334–36. In Dr. Kordesch's opinion, a fuel cell as classically defined provides for the continuous feed of fuel to both electrodes and the continuous removal of reactants. Tr. 335. As an example, Dr. Kordesch described an electrochemical cell in which both reactants are gases (e. g., hydrogen and oxygen) that are fed continuously to the electrodes. Tr. 335. (Moos refers specifically to such a "hydrogen-oxygen fuel cell" in the '909 patent. Plaintiff's exhibit 2, col. 5, line 40.) Dr. Kordesch suggested that a metal-air battery might be able to fit this definition of fuel cell if the metal reactant were continuously fed through the cell. In fact, Dr.

embellish on Moos' language, a cell with the "means for [continuously] providing fuel cell reactants to [both] electrodes"[64]—the BB–626, with a mechanically replaceable metal reactant, is more like a fuel cell as narrowly defined (which defendant argues the Moos patent specifies) than the Varta button cell.

Thus, even if the Court were to accept the Court of Claims determination of infringement as the law of this case, which it does not, the scope of the Court's inquiry on the question whether the Varta battery infringes either or both the '900 and the '909 patents would not be narrowed. A finding of noninfringement here would not be inconsistent with the Court of Claims decision in *Leesona Corp. v. United States, supra.* With this in mind and against the backdrop of the foregoing brief comparison of the Varta cell with the BB–626, the Court turns to the question of infringement.

### D. INFRINGEMENT

Before addressing the question whether the Varta metal-air battery infringes either or both of the Leesona patents, it is essential in this technically difficult case that the Court present in some detail its factual determinations concerning the accused device. The following paragraphs describe the essential features of the oxygen electrode of the Varta button-cell hearing-aid battery and address a number of disputed issues with respect to the composition and operation of defendant's electrode. After describing the electrode of the accused device, the Court turns first to the question of infringement of the '900 patent and then to the question whether the Varta cell infringes the '909 patent.

1. *The Varta Premium Plus TYP 4600 1.4V Battery*

There is little, if any, dispute between the parties as to the components of the Varta battery or how the product is manufactured. Varta's Kloss testified ably and at length on the production scheme for the air electrode of his employer's battery as well as on the steps followed in the assembly of the entire button cell.[65] The Court also was presented with analytic data on the contents of the Varta oxygen electrode.[66] The real factual questions with respect to the Varta cell center not on what it is (or what is in it) but on how the battery works.

a. *Elements and Manufacturing Process.* First, as to the product itself, the Varta button-cell hearing-aid battery is a metal-air electrochemical cell with a zinc electrode and an oxygen electrode. The oxygen (or gas) electrode contains an electrocatalyst layer bonded to a PTFE layer (or membrane). The Varta electrocatalyst consists of a mixture of PTFE and activated carbon. Both the PTFE, the trademarked product Hostaflon, and the activated carbon, known by the product name "Anthralur KC," are purchased by Varta from other manufac-

Kordesch believed that such a "zinc-air fuel cell," as he described it, was being manufactured in the United States today. Tr. 335–36.

The Court of Claims also recognized that the classical definition of fuel cell is as Dr. Kordesch described it. The court found: "Classically, both electrodes in a fuel cell are invariant, gaseous reactants are continuously fed to both electrodes, and ancillary equipment is utilized to control various operating conditions including temperature and pressure of the cell, electrolyte circulation, and by-product removal." *Leesona Corp. v. United States, supra,* 208 Ct.Cl. at 898, F.F. no. 3. But the court also found that the BB–626, a metal-air battery, could be referred to as a "hybrid type of fuel cell" because it combined aspects of a primary battery (*e. g.,* a consumable metal electrode) with those of a classical fuel cell (*e. g.,* noncon-

sumable, continuously fed gas electrode). *Id.,* F.F. no. 4. Dr. Frysinger's testimony was to the same effect, Tr. 60–61, and Dr. Cairns cautioned against construing the term "fuel cell" too narrowly. Tr. 553–54; plaintiff's exhibit 21, pp. 4–5.

The question whether the Varta metal-air battery is a fuel cell within the meaning of claim 9 of the '909 patent is discussed in part D(3) *infra.*

**64.** Plaintiff's exhibit 2, col. 8, line 35. *See* note 61 *supra.*

**65.** Kloss' testimony was aided by two physical displays illustrating the Varta production scheme. Defendant's exhibit 507.

**66.** Plaintiff's exhibits 11(a) & (b).

turers.[67] The PTFE-activated carbon catalyst layer is attached on one side to a silver-plated nickel screen that is used as a current collector and backed on the other side by the PTFE membrane.[68] Varta prepares its electrocatalyst or active material by mixing the activated carbon and the PTFE, in a proportion by weight of approximately seventy percent activated carbon and thirty percent PTFE, in a large high-speed blending machine spinning at about 2500 to 3000 revolutions per minute.[69] The resulting mixture of catalytically active material, to which no metal is added, is then rolled (or "nipped" between two rollers) to form the catalyst layer. The catalyst layer and the silver-plated nickel screen are pressed together by a second rolling operation, after which a third rolling operation bonds the catalyst-collector screen intermediate product to the electrode-backing layer of PTFE. From this ultimate three-layer product, which is produced in continuous strips approximately 100 meters long and ten centimeters wide, the small button-shaped oxygen electrodes are punched.[70]

b. *Activated Carbon Catalyst.* Although Varta does not intentionally add any metal to the catalytically active material in its electrode, the activated carbon that makes up seventy percent of the catalytic layer by weight does contain metal impurities. Moreover, some small amounts of

metal in the form of silver may well dissolve from the silver-plated nickel screen into the electrolyte, and migrate to and be deposited on the activated carbon-PTFE mixture that constitutes the Varta catalyst layer.[71] The two chemical analyses of the active material in Varta's catalytic layer, introduced by plaintiff [72] and described by Leesona's expert witness, Dr. Giner,[73] reveal the presence of metals such as cadmium, iron, magnesium, manganese, silver, vanadium, and zinc. The presence of zinc—which, at as much as 2500 parts per million parts ("ppm") (or 0.25 percent), along with iron (at 3000 ppm or 0.30 percent) was observed in the greatest amount—could well be accounted for because, as noted, it is the reactant used in the metal electrode. Similarly, the silver found (at 750 to 1000 ppm, or 0.075 to 0.1 percent) may be attributable to the migration of silver from the collector screen. The other metals found, however, presumably result from the impurities in the activated carbon, Anthralur KC, that defendant purchases to use as its electrocatalytic material.[74]

Each of the above seven metals appears in the Elmore and Tanner patent as among the metals listed as catalytic materials that may be used in the electrode structures in the '900 invention.[75] Nevertheless, even though catalytically active metals listed in

---

67. Kloss Tr. 258.

68. *Id.* Tr. 212–14.

69. *Id.* Tr. 226–29. In contrast, a portable electric room fan, for example, spins at about 400 revolutions per minute. *Id.* Tr. 227.

70. *Id.* Tr. 212–17.

71. Dr. Cairns recognized silver migration from the collector screen to the electrocatalytic material as a possible way in which the metal content of the defendant's electrocatalyst might be increased. Tr. 564–65.

72. Plaintiff's exhibits 11(a) & (b).

73. Giner Tr. 119–27.

74. The three chemical analyses conducted for plaintiff by the Jarrell-Ash Division of Fisher Scientific Company reveal cadmium ranging from 200 to 300 ppm (0.02 to 0.03%), iron at 1500 to 2500 ppm (0.15 to 0.25%), magnesium

at 500 to 600 ppm (0.05 to 0.06%), manganese at 100 to 200 ppm (0.01 to 0.02%), silver at the 750 to 1000 ppm (0.075 to 0.1%) noted in the text, vanadium at 200 to 300 ppm (0.02 to 0.03%), and zinc at 500 to 2500 ppm (0.05 to 0.25%). As Dr. Giner testified, Tr. 122, as a proportion of the Varta electrocatalytic material (the activated carbon) these metals are present in a somewhat higher amount (about 43% higher) because the Jarrell-Ash analyses are based on the PTFE-activated carbon mixture, rather than on the activated carbon (70% of the mixture) used as a basis. Inasmuch as the presence of catalytically active metals in the Varta activated carbon catalyst material is the actual question of interest, the use of carbon as the basis (and the concomitant upward adjustment of the above ranges by 43%) is, as Dr. Giner suggested, appropriate.

75. Plaintiff's exhibit 1 ('900 patent), col. 5, line 76 to col. 6, line 12.

the patent are present in small amounts in the Varta electrocatalyst layer, the Court finds that the primary catalyst in defendant's electrode is activated carbon. Although the presence of these small amounts of metals may have a significant effect on performance,[76] Varta does not rely on the presence of the metals to produce a marketable metal-air battery. Dr. Cairns and Varta's expert, Dr. Kordesch, agreed that it would be unwise for Varta to rely for electrode performance on the presence of metal impurities in the activated carbon or on the migration of silver from the collector screen to the catalytic material.[77] By preparing test electrodes, Varta conducts performance tests on samples from all of the batches of Anthralur KC it purchases.[78] But the Court is not persuaded that the fact that defendant conducts such tests alone demonstrates a reliance for electrochemical performance on the metal impurities in the activated carbon. Indeed, plainly Varta tests the Anthralur KC, among other things, to ascertain the quality of the carbon activation that enables carbon to function as an electrocatalyst.

Plaintiff does not appear to dispute that activated carbon serves as the electrocatalyst in defendant's electrode. Where Leesona and Varta disagree is over the enhancing effects on the carbon electrocatalyst of the small amounts of metal impurities in the Anthralur KC and of any silver that may dissolve from the collector screen into the electrolyte. Dr. Kordesch testified at length on the use of activated carbon as an electrocatalyst. None of the other expert witnesses, including Dr. Cairns,[79] disagreed with Dr. Kordesch's testimony that activated carbon may effectively be used as an electrocatalyst, at least where the carbon contains naturally occurring metal impurities. Despite Dr. Kordesch's opinion, as the Court understands it, that, once activated, pure carbon, without metal impurities, can work effectively as an electrocatalyst,[80] the experts agreed that to find and use such pure carbon would be, as Dr. Cairns put it, an "extremely unusual thing and require[ ] extraordinary efforts."[81] Presumably this would also be economically infeasible for mass production.

Carbon activation, in essence, is the process by which the porosity of the carbon material is increased. This results in a manifold increase in the surface area of the carbon material. Dr. Kordesch testified that, for example, in the activation of graphitic carbon by superheated steam, the surface area per unit volume of the carbon is increased about eight fold.[82] The increase in surface area and porosity enables the activated carbon electrocatalyst to function more efficiently by making the volume of the catalyst layer more accessible to the electrolyte and the reactant gas, and by providing increased surface area per unit volume over which the electrochemical reactions can occur.

Dr. Kordesch testified that there are a number of processes by which carbon can be "activated" from an inactive form, such as graphite. One such process, the process Dr. Kordesch believes is used to produce Anthralur KC, the activated carbon used by

---

**76.** See plaintiff's exhibit 30 and Giner Tr. 847–51 (evidence that the addition of silver at approximately 1000 ppm has effect on electrochemical cell performance). But see defendant's exhibit 525, pp. 552–53. (Appleby article, *Materials for Carbon-Based Primary and Secondary Air Electrodes*, presenting experimental results showing that the effect of metal impurities is nearly undetectable).

**77.** Cairns Tr. 564; Kordesch Tr. 341–42.

**78.** Kloss Tr. 220–21.

**79.** Cairns Tr. 534.

**80.** Kordesch Tr. 340–44. Varta's Kloss also expressed the view that activated carbon with no metal impurities could serve as an electrocatalyst. Tr. 224.

**81.** Cairns Tr. 538–39. See also Kordesch Tr. 281.

**82.** Kordesch Tr. 279–80. In the example Dr. Kordesch gave, the carbon was heated by the steam to a temperature of about 900° C and the surface area increase was from 100 to 800 square meters per gram. *Id.*

Varta,[83] involves exposing the unactivated carbon material to steam or carbon dioxide and then heating it up to a very high temperature, on the order of 900° C. The carbon material is "eaten away" by the super- heated steam or carbon dioxide, thereby increasing the porosity and surface area of the material.[84] Carbon can also be activated with metal salts.[85] Although Dr. Kordesch did not explain the metal-salt activation process, presumably in this process the carbon material is exposed to an aqueous metal-salt solution that, like any corrosive liquid, eats away at the carbon to increase porosity. In a metal-salt process, Dr. Kordesch testified, metal impurities are added to the activated carbon material, while in a steam or carbon dioxide activation process very little in the way of metal impurities is added to the activated material.[86]

None of the experts explained to the Court how metal and carbon, or metal-and-carbon, electrocatalysts actually work to catalyze the chemical reactions in an electrochemical cell. The Court has considered this question on the basis of all the evidence received and is of the view that a metal electrocatalyst and a pure activated carbon

electrocatalyst (assuming such pure activated carbon can be purchased) function somewhat differently, at least at the microscopic level. As the Court understands it, metal electrocatalysts enhance the chemical reactions directly, by causing the reactions to proceed faster, and thus serve as catalysts in a classic sense.[87] Activated carbon, on the other hand, absent the influence of metal does not affect the chemical reactions directly, but rather affords more surface area over which the reactions can occur and thus enhances electrochemical performance, not by directly speeding up the reactions, but by allowing more reactant activity to occur at a slower rate.[88] At the microscopic level, the Court finds this to be a significant difference, but at a macroscopic level, as discussed in part D(2)(b) *infra*, the Court sees this difference as far less important.

c. *PTFE Carbon Coating.* Turning to the final aspect of the Varta electrode that requires attention, the Court finds that defendant's mixing operation in its manufacturing process, in which PTFE and activated carbon are blended to form the Varta cell's active mass, does not result, as defendant claims, in the coating of carbon

---

**83.** The actual process used to produce Anthralur KC is proprietary information not known to Dr. Kordesch or to Varta. *Id.* Tr. 285.

**84.** *Id.*

**85.** *Id.* Tr. 281.

**86.** *Id.*

**87.** The dictionary defines "catalysis" as "the speeding up or, sometimes, slowing down of the rate of a chemical reaction by the addition of some substance which itself undergoes no permanent chemical change thereby." Webster's New World Dictionary of the American Language 222 (2d college ed. 1972).

**88.** As a simple example, consider two water pipes, pipe A with a cross-sectional area of 1 square meter and pipe B with a cross-sectional area of 8 square meters. Pipe B represents an electrocatalyst of activated carbon, with enhanced surface area, and pipe A a catalytic layer of a catalytically active metal. If the speed of the water is taken to represent the rate of electrochemical reactions, then in 1 second pipe B with a water speed of 1 meter per second (that is, with no enhanced rate of reaction) will discharge 8 cubic meters of

water, while in that same 1 second pipe A, with water flowing through it at the greater speed of 8 meters per second (that is, at an enhanced reaction rate), also will discharge 8 cubic meters of water. Both water pipe systems produce the same result—the delivery of 8 cubic meters of water per second—but each does it in a different way.

Another difference between metal and activated-carbon catalysts is that in a hydrogen-oxygen fuel cell, *see* note 63 *supra*, the latter electrocatalyst, as Dr. Stonehart testified, operates effectively as a catalyst in the reduction of oxygen gas to hydrogen peroxide but less effectively in the reduction of hydrogen peroxide to water. Tr. 427–28. According to Dr. Stonehart, metal catalysts, on the other hand, work effectively on the entire two-step reduction of oxygen from oxygen gas to hydrogen peroxide to water, thus resulting in little hydrogen peroxide buildup in the electrochemical cell. Tr. 428. The reduction of oxygen in the Varta cell, however, since it is not a hydrogen-oxygen fuel cell, results in a final product of zinc oxide. *Id.* It was never explained to the Court if activated carbon has a different effect on intermediate zinc-oxygen products than a metal electrocatalyst does.

with PTFE. Varta maintains that its high-speed mixing operation, in Dr. Kordesch's words, "chops up" the long PTFE molecules and causes the PTFE to coat the active carbon rather than to become mixed with the catalyst material as the '900 patent provides. The PTFE begins to vaporize in the Varta process, according to Dr. Kordesch, as a result of the heat generated by the fierce mechanical activity in defendant's mixing operation. Thus, when the vaporized PTFE condenses, it acts more as a coating to the carbon catalyst particles than as a part of an admixture.[89]

Dr. Stonehart testified along the same lines as Dr. Kordesch. In fact, through Dr. Stonehart defendant took the rather unusual approach of introducing expert testimony by asking the expert witness to conduct a scientific experiment in open court.[90] In this experiment Dr. Stonehart compared a sample of the PTFE-activated carbon mixture prepared by Varta at its manufacturing facilities in Germany with a sample mixture, prepared in court, of seventy percent Hostaflon, the PTFE used by Varta, and thirty percent Anthralur KC, defendant's activated carbon material. Dr. Stonehart dropped relatively equal amounts of the two sample mixtures into separate glass beakers containing the electrolyte used in the Varta cell. The result observed by the Court was that all of the Varta-prepared mixture floated at or near the surface of the electrolyte, while the mixture prepared in Court separated, part settling and part floating near the surface.

In Dr. Stonehart's opinion, this experiment demonstrated that the Varta electrode is more than a simple mixture. Such a simple mixture, in which no PTFE coating occurs, is demonstrated, in Dr. Stonehart's view, by the separation observed for the mixture prepared in court—the hydrophobic PTFE rose to the surface and the activated carbon settled. In contrast, Dr. Stonehart testified that all of the Varta PTFE-activated carbon mixture floated to the surface because the carbon had become coated, or "wetproofed," by the PTFE.[91] His view is that the coating of carbon by PTFE in the Varta electrode brings defendant's electrode composition well within prior art, which had disclosed an activated carbon catalyst coated with a wetproofing material.[92]

Commenting on Dr. Stonehart's in-court experiment, Dr. Cairns offered the view that the buoyancy observed for the Varta-prepared catalyst material was attributable not to PTFE coating but to an agglomeration of small PTFE particles and larger activated carbon particles. Although on the basis of this experiment he was prepared to recognize that PTFE-carbon mixtures prepared in a high-speed blender might exhibit different properties from such mixtures prepared otherwise, the court expert did not believe that in the Varta process PTFE would vaporize or begin to vaporize and then coat the activated carbon material. In Dr. Cairns' view, Dr. Stonehart's experiment merely demonstrated that separation would be likely to occur in a PTFE-carbon mixture that is not very thoroughly mixed.[93]

During the overnight break between the trial day on which Dr. Stonehart conducted his in-court experiment and the day on which Dr. Cairns testified, plaintiff conducted an electron microscope analysis of the Varta PTFE-activated carbon catalyst layer.[94] Eight electron microscope "scans," as they are called, performed at various electron voltage settings and degrees of

**89.** Kordesch Tr. 306–11.

**90.** Stonehart Tr. 398–401.

**91.** *Id.* Tr. 403.

**92.** *Id.* Tr. 401–04. In particular, Dr. Stonehart referred to U.S. Patent No. 2,275,281, defendant's exhibit 34, which was issued to Ernst Berl in 1942. The Court of Claims in *Leesona Corp.*

*v. United States, supra*, 208 Ct.Cl. at 904, F.F. no. 13, specifically referred to the Berl patent and distinguished it from the Elmore and Tanner invention.

**93.** Cairns Tr. 575–78.

**94.** *See* Giner Tr. 844–47, 865–71.

magnification,[95] were presented to Dr. Cairns in the form of black-and-white photographs. Although the court expert cautioned that he was not an expert in the particular scientific specialty of electronmicroscopy, the Court permitted him to give his interpretation of the scans. In Dr. Cairns' view, the scans reflect a mechanical mixing of PTFE and activated carbon rather than the PTFE coating of carbon that would result from a chemical bonding of PTFE to the carbon particles or a PTFE vaporization and subsequent condensation on the carbon. Dr. Cairns testified that he thought the Varta mixture of PTFE and activated carbon could be separated, if there were an adequate means of mechanically manipulating the small PTFE and carbon particles.[96]

The Court finds that, while the Varta PTFE-activated carbon mixing process may result in some bonding of PTFE and carbon particles, it does not result in a coating of carbon with PTFE.[97] Defendant's process does not result in the near complete carbon coating described in prior art such as the Berl patent.[98]

### 2. Infringement of Elmore and Tanner No. 3,419,900

■ The general test of patent infringement follows a two-step analysis. First, the Court must determine if the accused device reads literally on, or infringes directly, the language of the claims in the patent. Second, if the Court does not find that the patent has been infringed directly, it must then look to see if application of the doctrine of equivalents nevertheless leads to a finding of infringement. See Ziegler v. Phillips Petroleum Co., 483 F.2d 858, 868

(5th Cir.), cert. denied, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

Assuming for its purposes here that the '900 patent is valid, the Court addresses both steps in the infringement test in the following paragraphs to determine if the Varta metal-air battery infringes the Elmore and Tanner patent. After applying the test to the '900 patent, the Court undertakes the same two-step analysis for the Moos '909 invention.

■ a. Direct Infringement. In considering whether a product directly or literally infringes a patent, "resort must be had in the first instance to the words of the claim." Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). If the allegedly infringing device falls squarely within the literal language of the claims, a case of direct infringement is established. Id.; Continental Oil Co. v. Cole, 634 F.2d 188, 191 (5th Cir. 1981), petition for cert. filed, 49 U.S.L.W. 3932 (U.S. May 12, 1981) (No. 80–2037).

■ The Court finds that the Varta button cell does not infringe the '900 patent directly. The Varta battery, as described above, contains all of the elements specified in claim 4 of the '900 patent, except one. No matter how persistently plaintiff argues to the contrary, the Court simply cannot read the words "metal containing electrocatalyst particles"[99] in claim 4 to cover the Varta cell's oxygen electrode. On the other hand, although defendant argues otherwise, the Court finds that the Varta gas electrode contains the "admixture" of fluorocarbon polymer (PTFE) and catalyst that claim 4

---

95. Plaintiff's exhibits 23 & 23A–23G.

96. Cairns Tr. 582.

97. Called again to testify after the inquiry of Dr. Cairns had been completed, Dr. Stonehart testified that, though he agreed in many respects with the court expert's interpretation of the electron microscope scans, in his view the Varta process would at least result in a partial coating of carbon with PTFE. Tr. 691.

98. See note 92 supra. In Berl, for example, the coated activated carbon catalyst is prepared by

combining powdered activated carbon in solution with the wet-proofing substance. The solution is sprayed onto the electrode, and the solvents are evaporated off to leave the dry coated carbon. Defendant's exhibit 34, p. 2. Obviously, the Berl process is completely different from that employed by defendant to produce its electrode.

99. Plaintiff's exhibit 1 (the '900 patent), col. 8, lines 1–2.

calls for.[100] Even with a substantial bonding of PTFE and activated carbon particles in the catalytic layer of defendant's electrode, the composition must still be regarded as a mixture of PTFE and carbon, and not as a coating of carbon particles with PTFE.

Claim 4 specifies, *inter alia*, a catalytic layer in the gas electrode "containing a substantially uniform admixture of metal containing electrocatalyst particles and a fluorocarbon polymer."[101] Plaintiff argues that so long as any amount of metal is present in the electrocatalyst material of an otherwise identical device, claim 4 is directly infringed. The Court cannot agree. The Elmore and Tanner patent contemplates a metal electrocatalyst. Carbon, in activated or inactivated form, is not a metal.[102] Moreover, the patent nowhere mentions carbon or activated carbon as a potential electrocatalyst. Yet it specifically lists some forty other "catalytic materials which may be used."[103] Though enhanced perhaps by the presence of small amounts of metal impurities and silver migrating from the collector screen, the Varta electrocatalyst cannot be said to be a metal catalyst.

Plaintiff maintains that the words "metal containing" in claim 4 should be read as if there were a hyphen between them, *i. e.*, as if claim 4 called for an "admixture of metal-containing electrocatalyst particles." Read this way, of course, the electrocatalyst particles would only have to contain metal and not themselves be metal. The Varta cell, then, according to plaintiff, would literally infringe claim 4 because its activated carbon electrocatalyst is concededly "metal-containing." The Court recognizes that this argument is not without support. Indeed, the abstract of the disclosure in the '900 patent itself uses "metal-containing" (with hyphen).[104]

Nevertheless, construing the language of claim 4 in light of the disclosures of the patent as a whole, the relevant prior art, and the history of the patent application in the Patent Office, *see, e. g., Decca Ltd. v. United States,* 420 F.2d 1010, 1013 (Ct.Cl.) (per curiam), *cert. denied,* 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970), the Court finds that claim 4 cannot be read literally to encompass an activated carbon electrocatalyst, even if this catalyst contains some catalytically active metal materials. The "hyphen" discrepancy may very well be the result of an inartful drafting of claim 4. But, even if the Court were to construe the claim as if the words were hyphenated, it would still read the claim to require a metal electrocatalyst. There is no persuasive evidence that Elmore and Tanner considered activated carbon to be a potential catalytic material that could be used in the electrochemical cell they were disclosing.[105]

■ b. *Infringement Under the Doctrine of Equivalents.* The doctrine of equivalents permits a patent holder to extend the monopoly beyond the precise device patented to equivalent devices. The doctrine is founded on the theory that "if

100. *Id.,* col. 8, line 1.

101. *Id.,* col. 8, lines 1–3.

102. Kordesch Tr. 287–88.

103. Plaintiff's exhibit 1 (the '900 patent), col. 5, line 73, to col. 6, line 12.

104. *Id.,* col. 1, line 18. The abstract in its entirety reads:

Lightweight electrodes and an electrochemical cell utilizing the said electrodes are described. The lightweight electrodes comprise a catalytic layer containing a substantially uniform admixture of metal-containing electrocatalyst particles and fluorocarbon polymer. When the electrode is disposed of in the electrochemical cell, the catalytic layer is exposed to the electrolyte of the cell. There

is further described electrolytes comprising an eutectic mixture of at least two alkali metal hydroxides substantially free of water and electrolytes having a paste-like consistency at a temperature below about 300° C. *Id.,* col. 1, lines 16–26.

105. Indeed, the evidence strongly suggests that it was not until after the Elmore and Tanner applications were filed that Leesona began investigating the use of activated carbon as an electrocatalyst—*see* defendant's exhibits 415–418 & 420 (suggesting Leesona first began experiments on carbon-only catalysts in 1968) and Stonehart Tr. 638–41—the testimony of Dr. Frysinger, Tr. 770–81 & 808–33, and plaintiff's exhibits 32 & 32A–32E notwithstanding.

two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra*, 339 U.S. at 608, 70 S.Ct. at 856 (quoting *Machine Co. v. Murphy*, 97 U.S. 120, 125, 24 L.Ed. 935 (1877)). Thus, as the doctrine has come to be stated in its well-recognized form, a device will be found to be infringing if it performs "substantially the same function in substantially the same way to obtain the same result." *Id.* (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)). *See also Continental Oil Co. v. Cole, supra*, 634 F.2d at 191, and *N. V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp.*, 590 F.2d 415, 421 (2d Cir. 1978).

▆▆▆▆ The question of infringement by equivalence is one of fact, and a question on which expert testimony is of great assistance. As the Supreme Court instructed in *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra*, 339 U.S. at 609, 70 S.Ct. at 857:

> Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

In his preliminary report, Dr. Cairns gave an unconditional "yes" in answer to the question, put to him by plaintiff, whether

> the Varta electrochemical cell utilizing a non-consumable cathode having a catalytic layer which consists essentially of a mixture of active carbon and fluorocarbon polymer and a silver plated screen perform[s] substantially the same func-

tion in substantially the same way and obtain substantially the same result as does the electrochemical cell defined in claim 4 of the '900 patent.[106]

The court expert reaffirmed this opinion at trial.[107] In Dr. Cairns' view, the Varta catalyst of activated carbon with its metal impurities is the equivalent of the metal catalyst disclosed in claim 4. There is no "important scientific difference, or difference in the art," Dr. Cairns testified, "between electrode structures . . . and their operation in the case of electrocatalysts which are comprised of metal only and electrocatalysts which are comprised of metal and/or carbon, or, in fact, [of] carbon itself." [108] Nothing the Court heard at trial and none of the exhibits in evidence persuades it that the court expert's opinion is unsound.

▆▆▆ Dr. Cairns testified that, in his view, the essential inventive feature of the '900 patent is the fluorocarbon-electrocatalyst mixture.[109] The Court recognizes that, at least at a microscopic level, there may well be a distinction between the way a metal catalyst catalyzes the reactions in an electrochemical cell such as the Elmore and Tanner patent discloses and the way an activated carbon electrocatalyst (at least a pure carbon catalyst) operates in this catalysis.[110] But on a larger scale both activated carbon and metal catalysts, once mixed with PTFE, serve to enhance the energy-producing chemical reactions at the gas electrode in the cell. In both cases the PTFE-catalyst mixture enables the chemical reactions to occur throughout the volume of the catalytic layer. Moreover, to the extent that the metal impurities present in the Varta electrocatalyst have a positive effect on electrochemical performance, the difference even at a microscopic level diminishes further. It is enough that the court expert, a person reasonably skilled in the art, sees activated carbon as inter-

---

**106.** Plaintiff's exhibit 21, p. 9.

**107.** Cairns Tr. 501.

**108.** *Id.* Tr. 534.

**109.** *Id.* Tr. 589.

**110.** *See* notes 87–88 and accompanying text *supra*.

changeable as the catalyst ingredient with the metal disclosed in the '900 patent. The Court therefore finds that the Varta cell performs substantially the same function (executing the desired electrochemical reactions to generate current) in substantially the same way (by using as its catalytic layer a mixture of a fluorinated hydrocarbon polymer and a catalyst material) to obtain the same result (enabling the electrochemical reactions to occur throughout the volume of the catalytic layer).

Defendant argues that Leesona's failure to investigate activated carbon as an electrocatalyst, coupled with the Elmore and Tanner patent's failure to disclose carbon as a catalyst, should preclude application of the doctrine of equivalents. The Court sees no reason why such an "inverse doctrine of equivalents," to use defendant's term, should be applied in this case. *Cf. Harris v. Allen*, 15 F. 106 (N.D.Ill.1883) (narrowly construing patent claim but not mentioning doctrine of equivalents or its so-called "inverse"). The equivalents doctrine was developed to "prevent an infringer from stealing the benefit of the invention," *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 692 (2d Cir.), *cert. denied*, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948), merely by changing an ingredient that one reasonably skilled in the art would have realized or readily discovered was interchangeable. It is not necessary to a finding of infringement under the doctrine of equivalents that the Court determine that the patentees, or the patent holder Leesona in this case, had developed the interchangeable ingredient at the time the invention

was patented. The Court need only find, as it does here, that persons reasonably skilled in the art—not necessarily the patentee—would have known that such an interchangeable ingredient could be developed.

Leesona's failure to investigate activated carbon as an electrocatalyst may properly be considered in construing whether the patent itself actually claims to cover such a catalytic material. But a patentee or patent holder's determination not to investigate equivalent ingredients for its own patent ought never to preclude resort to the doctrine of equivalents to prove infringement on the basis of someone else's use of those equivalents. After all, it will often be the case that a patent holder has little, if not the least, motivation to develop equivalent ingredients for its patent. Indeed, it is the person seeking to avoid the patent who has the greatest incentive to find an interchangeable ingredient that will take its device outside the infringement umbrella of the equivalents doctrine—that is, to find an ingredient that persons reasonably skilled in the art would *not* have known was interchangeable.

Finally with respect to the doctrine of equivalents as it applies to the '900 patent, the Court notes that defendant does not contend that plaintiff is limited in its resort to this doctrine by the doctrine of file wrapper estoppel.[111] Varta does not contend that the file history of the Elmore and Tanner patent demonstrates that the patentees narrowed their claims by deleting references to carbon as an electrocatalyst.[112]

111. The doctrine of file wrapper estoppel is discussed further in connection with the question of infringement of the '909 patent under the doctrine of equivalents. *See* part D(3)(b) *infra*.

112. Varta correctly points out that prior art such as the patents issued to Berl, U.S. Patent No. 2,275,281, defendant's exhibit 34, *see* note 98 *supra*, Ruetschi, U.S. No. 2,951,106 (patented in 1960), and Podolsky *et al.*, U.S. No. 2,730,597 (1956), disclose activated carbon as a catalytic material and that Elmore and Tanner altered their claims to overcome the Patent Office's rejection of certain of their claims as anticipated by these patents. This much is

disclosed by the '900 patent's file wrapper. *See* plaintiff's exhibit 1(a), pp. 40–44. The patentees, however, did not alter their claims to overcome the disclosure in these patents of activated carbon as an electrocatalyst, but rather to overcome the carbon-coating aspects of these inventions. Moreover, although it may be argued that Elmore and Tanner narrowed their claims to remove any claim to an invention covering the coating of carbon with a fluorocarbon polymer, *see, e. g.*, plaintiff's exhibit 1(a), pp. 43 & 54, the doctrine of file wrapper estoppel would not come into play in this regard because the Court finds both (1) that, as plaintiff concedes, the '900 patent does not encompass PTFE-coated electrocatalyst particles

As has already been developed, Elmore and Tanner never disclosed activated carbon as an electrocatalyst material.[113]

### 3. *Infringement of Moos No. 3,276,909*

■ a. *Direct Infringement.* The Court concludes that the accused Varta device does not directly infringe claim 9 of the '909 patent. Claim 9 specifies a "means for providing . . . reactants to [the] electrodes" and a "catalytically activating metal layer."[114] Inasmuch as the Varta cell contains neither the means for providing reactants to *both* electrodes nor a metal catalytic layer, the Court finds that the accused device is not described by the literal language of the claim.

In the Court's view, the Moos patent describes what "purists," as Dr. Giner described them,[115] would consider to be a classic fuel cell—that is, an electrochemical cell in which the reactants are continuously fed to both electrodes.[116] The drawing in figure 4 of the Moos patent illustrates what the Court understands such a classic fuel cell to be. The Court, however, does not read claim 9 only to cover fuel cells as classically defined, and it is not Moos' use of the term "fuel cell," in and of itself, that causes the Court to read claim 9 as it does. Indeed, the Court declines to adopt a narrow, classic definition of "fuel cell." Rather, it is the provision in claim 9 that requires a means for supplying reactants to both electrodes that compels the Court to construe the language of the claim only to cover an electrochemical cell where both reactants are continuously supplied (or at least, as with the BB–626, where the metal reactant can be mechanically replenished).

For the reasons stated earlier in this opinion, the Court finds that the Varta button cell does not have a metal electrocatalyst. The '909 patent, even more clearly than claim 4 of the '900 patent, specifies a metal electrocatalyst. Although in Dr. Giner's opinion the silver that migrates from the Varta collector screen and the metal impurities in defendant's activated carbon constitute the "metal layer" called for in claim 9,[117] in Dr. Cairns' view the Varta cell does not contain a metal layer.[118] Dr. Kordesch also testified that "[t]here is no metal layer in the Varta electrode."[119] Moreover, the '909 patent nowhere discloses anything other than a metal electrocatalyst.

b. *Infringement Under the Doctrine of Equivalents.* Turning to the question whether the accused device infringes claim 9 of the '909 patent under the doctrine of equivalents, the Court notes first that in his preliminary report Dr. Cairns also gave an unconditional "yes" to the following question, similar to the one he was asked concerning claim 4 of the '900 patent, and again put to him by plaintiff:

> Does the Varta cell utilizing a non-consumable cathode having a catalytic layer which consists essentially of a mixture of active carbon and fluorocarbon polymer and a silver plated screen with this catalyst layer in contact with a fluorocarbon polymer layer, with the fluorocarbon polymer layer being in contact with the reactant gas, perform substantially the same function in substantially the same way and obtain substantially the same result as does the invention of claim 9 of the '909 patent?[120]

At trial Dr. Cairns confirmed that this was still his view.[121]

---

and (2) that in the Varta electrode the carbon catalyst material is not coated with PTFE.

**113.** *See* Tr. 1016–17 (remarks of defendant's counsel).

**114.** Plaintiff's exhibit 2 (the '909 patent), col. 8, lines 35 & 39. *See* note 44 *supra*.

**115.** Giner Tr. 138.

**116.** *See* note 63 *supra*.

**117.** Giner Tr. 150.

**118.** Cairns Tr. 555; plaintiff's exhibit 21, p. 8.

**119.** Kordesch Tr. 333.

**120.** Plaintiff's exhibit 21, p. 9.

**121.** Cairns Tr. 502. Before reaffirming his view on the equivalence of the Moos disclosure and the Varta cell, Dr. Cairns hesitated briefly because the '909 patent itself contained insuffi-

The Court finds that the essence of the Moos invention is the use of a hydrophobic polymer membrane, as a backing to a gas electrode, to prevent liquid electrolyte from leaking from the electrochemical cell, while at the same time permitting gas to diffuse into the electrode. Although it became clear to the Court that Dr. Cairns did not consider the Moos patent to be particularly strong because of the absence of scientific data in the patent demonstrating the performance capabilities of the electrode structures described by the patentee,[122] it is equally clear to the Court that Moos' contribution of a cell structure with a hydrophobic membrane electrode backing is recognized as significant development in the art. Dr. Cairns said as much in his preliminary report[123] and at trial,[124] and no other witness really disputed this conclusion.[125]

The Varta cell concededly employs the hydrophobic membrane backing disclosed by Moos. Defendant's argument, however, is that nothing else about its electrochemical cell is described by the '909 patent. In support of this argument, defendant makes three contentions. First, Varta asserts, the '909 patent is directed to fuel cells. Defendant argues that its battery is not a fuel cell. Second, Moos makes no mention of a PTFE-catalyst mixture in one of the gas electrodes, yet Varta employs such a mixture in its oxygen electrode. Third, claim 9 of the Moos patent speaks of a metal catalyst layer. Varta maintains not only that its catalyst is not a metal layer, but also that it uses no metal catalyst at all.

Concerning the first of these contentions, the Court recognizes that the Varta battery is not a fuel cell as classically defined. But the oxygen electrode in defendant's cell is a fuel cell electrode—that is, the very type of electrode that would be used in constructing a classical fuel cell. Moreover, as Dr. Cairns[126] and Dr. Giner,[127] and even Dr. Kordesch,[128] testified, there is no clear understanding in the art that a metal-air battery such as Varta's is not a fuel cell. In addition, the Court is of the view that a key element of the Moos patent is the use of a hydrophobic membrane as an electrode backing for the electrode containing the catalytic layer. The use of a metal reactant fuel, instead of a gas reactant, at the other electrode is not, in the Court's view, a significant deviation from claim 9 of the '909 patent. In other words, the interchanging of a metal electrode for the gas electrode that does not contain the catalytic layer is a step that persons reasonably skilled in the art would have recognized could be taken. Similarly, inasmuch as the Varta cell has a "means for providing [a] fuel cell reactant[ ]"[129] to the gas electrode (the electrode containing the catalytic layer), under the expanded reading of claim 9 afforded by the doctrine of equivalents, defendant's battery falls within the Moos patent.

With respect to the second of defendant's contentions, the Court agrees that the Moos patent cannot be construed to describe an electrode containing a catalytic layer comprising the PTFE-catalyst mixture disclosed by Elmore and Tanner. Thus, were it to focus only on the catalytic layers of the Varta cell and the cell described in claim 9 of Moos, the Court would be compelled to conclude that, specifically with respect to the chemical activity in the catalytic layers themselves, the Moos and Varta cells are not equivalent.

cient data on which the court expert could base a conclusion. Nevertheless, he testified, the work of other investigators enabled him to form an opinion on this question. *Id.*

**122.** *See, e. g.,* Cairns Tr. 590–91, and plaintiff's exhibit 21, pp. 11–12.

**123.** Plaintiff's exhibit 21, p. 12.

**124.** Cairns Tr. 510.

**125.** The Court of Claims also recognized this as Moos' contribution. *Leesona Corp. v. United States, supra,* 208 Ct.Cl. at 907–08, F.F. nos. 19–20.

**126.** Cairns Tr. 553–54.

**127.** Giner Tr. 137–38.

**128.** Kordesch Tr. 335.

**129.** Plaintiff's exhibit 2 (the '909 patent), col. 8, line 35.

In the Court's view, however, such an approach would be far too restrictive. Just because an accused device is an improvement over a patented device does not mean that the accused device does not also infringe the patent. *Decca Ltd. v. United States*, 544 F.2d 1070, 1080–81 (Ct.Cl.1976) (per curiam). "It is well established that an improver cannot appropriate the basic patent of another and that the improver without a license is an infringer and may be sued as such." *Temco Electric Motor Co. v. Apco Manufacturing Co.*, 275 U.S. 319, 328, 48 S.Ct. 170, 173, 72 L.Ed. 298 (1928). Thus, even putting aside the disclosures of Elmore and Tanner and assuming defendant had itself developed the fluorocarbon-catalyst mixture there disclosed, the Court would still find that under the doctrine of equivalents the Varta cell infringes the '909 patent because, although an improvement, it uses the essential inventive feature contributed by Moos.

Dr. Cairns' testimony supports this conclusion. The court expert agreed that an electrochemical cell such as Varta's, without a fluorocarbon polymer mixed into the catalytic layer, would correspond more closely to claim 9 of Moos than the actual Varta battery.[130] He also agreed that an electrode structure that contains PTFE or another fluorocarbon polymer performs better than one without.[131] But Dr. Cairns adhered to the view expressed in his preliminary report[132] that the Varta cell and the invention disclosed in claim 9 of Moos, apart from the particular advantages of the PTFE-catalyst mixture in the Varta catalytic layer, perform substantially the same function in substantially the same way to produce the same result.[133]

As for defendant's third contention, the Court has already held that the Varta battery does not employ a metal electrocatalyst, but rather uses an activated carbon catalyst with, perhaps, enhanced catalytic capabilities resulting from the presence of metal impurities. It was Dr. Cairns' view, however, that it would have been obvious to one skilled in the art "that carbon or metal on carbon could also be used in the same way."[134] The Court sees no appreciable difference between the question of interchangeability of the Varta activated carbon-based catalyst and the metal catalyst described in claim 4 of the Elmore and Tanner patent and the question of interchanging the Varta catalyst and the metal-layer catalyst in claim 9 of Moos. In both instances, once it is recognized that the '900 and '909 cells can readily be modified to take an activated carbon catalyst, infringement as to that aspect of the patents is made out. As long as the Varta activated carbon and the catalytically active metals disclosed in the '900 and '909 patents function to enhance the electrochemical reactions that occur at the oxygen electrode, the accused device is the equivalent of the invention disclosed in claim 9 of the Moos patent. The Court therefore finds that defendant's button cell infringes claim 9 of the '909 patent under the doctrine of equivalents. Varta's hearing-aid battery performs substantially the same function (executing the desired electrochemical reactions to generate current) in substantially the same way (by using a hydrophobic polymer membrane backing on the gas electrode) to obtain the same result (allowing gas to diffuse into the electrode while preventing electrolyte from leaking out of the electrochemical cell).

Defendant maintains, however, that, even if the Court finds that Varta's device and the electrochemical cell described in the '909 patent are equivalent, plaintiff should be foreclosed from resort to the doctrine of equivalents by the doctrine of file wrapper estoppel. Under the latter doctrine, "claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previous-

---

**130.** Cairns Tr. 548.

**131.** *Id.* Tr. 552.

**132.** Plaintiff's exhibit 21, p. 9.

**133.** Cairns Tr. 549–51.

**134.** Plaintiff's exhibit 21, p. 8.

ly by limitation eliminated from the patent." *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966). This doctrine curtails the use of the doctrine of equivalents to apply the claims as broadly as the equivalents doctrine would allow if the narrowing amendments to the patent application, limiting the claims, had not been made. *Schimizzi v. Chrysler Corp.*, 462 F.Supp. 630, 634 (S.D.N.Y.1978). Such an estoppel also can arise where claims rejected as reading on prior art are abandoned, leaving only the narrower claims on which the patent issued. *Capri Jewelry Inc. v. Hattie Carnegie Jewelry Enterprises, Ltd.*, 539 F.2d 846, 851–52 & nn. 8–9 (2d Cir. 1976); *Schimizzi v. Chrysler Corp., supra*, 462 F.Supp. at 634.

■■■ File wrapper estoppel, however, does not arise where claims were rejected for indefinite disclosure [135] and not because they read on prior art. *Koppers Co. v. S & S Corrugated Paper Machinery Co.*, 517 F.2d 1182, 1185 (2d Cir. 1975); *Schimizzi v. Chrysler Corp., supra*, 462 F.Supp. at 634. *See also Cohn v. Coleco Industries, Inc.*, 558 F.2d 53, 59 (2d Cir. 1977).[136] The file wrapper of the Moos patent reveals that in the prosecution of the patent, in response to an oral communication by telephone from the patent examiner to the patentee's attorneys, Moos amended the claim that became claim 9 of the '909 patent to insert "layer" after the phrase "catalytically activating metal," which appears at two places in claim 9.[137] Defendant argues that this

amendment, because it changed claim 9 to require a metal layer in the Moos cell's electrode rather than just the presence of a catalytically activating metal, precludes plaintiff's now broadening the claim to encompass a catalytic layer that is not a metal layer. This argument is unpersuasive.

The Court recognizes that the '909 patent's file history does not reveal precisely why Moos was requested to amend what is now claim 9 to specify a metal catalytic layer. The only evidence bearing on the subject is the remark of Moos' counsel submitted with the amendment. There counsel said:

[T]he Examiner requested that "layer" be inserted in the claims after "catalytically activating metal" in order to avoid having the claims read on the structure wherein only a spot of metal appeared on the polymer matrix. It is appreciated, however, that the layer referred to does not have to be completely continuous but will include porous films, coatings of metal blacks, etc.[138]

Counsel's statements, though naturally they seek to cast the examiner's requests in a light most favorable to the patentee, do not suggest that the patent examiner sought the amendment because the claim otherwise would read on prior art. Nor is there any other evidence in the file wrapper that demonstrates this amendment was made to narrow claim 9 to overcome unpatentability over prior art. The last official written

---

135. The specifications required by 35 U.S.C. § 111 as part of a patent application must, under 35 U.S.C. § 112,

 contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and . . . set forth the best mode contemplated by the inventor of carrying out his invention.

 The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

136. For an excellent discussion of the application of such a "non-art" version of file wrapper estoppel—that is, application of the doctrine

where claims were amended or abandoned during prosecution of the patent application to avoid rejection for reasons other than unpatentability over prior art—see Note, *The Applicability of the Doctrine of File Wrapper Estoppel to Prevent Recapture of Abandoned Patent Claims*, 54 St. John's L.Rev. 767, 780–86 (1980) [hereinafter "File Wrapper Estoppel Note"]. *See also* 4 Walker on Patents 90 (Deller ed. 1965) ("Additions made for the purpose of clarity and definiteness . . . do not create an estoppel.").

137. Plaintiff's exhibit 2(a), pp. 52–54. *See also* plaintiff's exhibit 2 (the '909 patent), col. 8, lines 37–39.

138. Plaintiff's exhibit 2(a), p. 54.

response by the Patent Office to Moos' application discusses only prior art covering electrode-backing materials used in the type of film that is the essence of the '909 patent.[139]

In an apparent effort to persuade the Court that the doctrine of file wrapper estoppel applies to narrowing amendments made for other than prior-art reasons, defendant directs the Court to the court of appeals' statement in *International Latex Corp. v. Warner Brothers Co.*, 276 F.2d 557, 565 (2d Cir.), *cert. denied*, 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960) (quoting *Deitel v. Unique Specialty Corp.*, 54 F.2d 359, 360 (2d Cir. 1931) (per curiam)), that "the rejection of a claim forbids 'any interpretation of those [claims] secured which leaves them identical with that rejected' or any use of the doctrine of equivalents to that end." While this statement was made by the *International Latex* court in the context of applying the doctrine of file wrapper estoppel to a narrowing amendment made to overcome a prior art rejection, in the *Deitel* case quoted in that opinion the court of appeals declined to apply the doctrine of equivalents for reasons other than a prior-art file wrapper estoppel. The *Deitel* court, concluding that the doctrine of file wrapper estoppel could not properly be applied, simply held that there was "no ground for resorting to the doctrine of equivalents when the claims speak plainly and the invention is a trifling step forward." 54 F.2d at 360. Moreover, elsewhere in the *International Latex* opinion, in a non-art context, the court of appeals, recognizing the equitable foundation of the doctrine of equivalents, declined to give certain other patent claims as broad a coverage as application of the doctrine might otherwise suggest, because the patentee had "drastically narrowed his claims to overcome difficulties in the patent office." 276 F.2d at 564.

Even accepting, however, that the breadth of coverage otherwise appropriate under the doctrine of equivalents may be curtailed on the basis of such equitable non-prior art considerations, the Court in this instance declines to do so. In this Court's view, if a file wrapper estoppel is to arise at all in connection with non-art amendments, it should arise only where the changes made were essential to the scope of the invention.[140] In the case of the '909 patent, as the Court already has discussed in some detail, the essence of the invention is the polymer membrane electrode backing. On the basis of the evidence presented, the Court does not find that the amendment specifying a catalytic "metal layer" could have been essential, or even particularly important, to the scope of the Moos invention. Moreover, this amendment did not "drastically" narrow Moos' claims, *International Latex Corp. v. Warner Brothers, Co.*, *supra*, 276 F.2d at 564, nor can it be said, as the court found in *Deitel v. Unique Specialty Corp.*, *supra*, 54 F.2d at 360, that the invention described in the '909 patent constituted merely a "trifling" development in the art of electrochemistry.[141] Accordingly, the Court finds that claim 9 of the Moos patent may be accorded the full scope available under the doctrine of equivalents.

### E. VALIDITY

By statute, a patent is presumed valid, and the burden of establishing invalidity is on the party asserting it. 35 U.S.C. § 282. The statutory presumption is reinforced if at the time it granted the patent the Patent Office had before it the most relevant prior art. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 268 (2d Cir. 1967); *Brennan v. Mr. Hanger, Inc.*, 479 F.Supp. 1215, 1220 (S.D.N.

139. *Id.*, pp. 31–33.

140. *See* File Wrapper Estoppel Note, *supra* note 136, at 784–85.

141. Although Dr. Cairns, for example, considered the Moos disclosures somewhat weak because of the dearth of scientific data in the '909 patent demonstrating the advantages

of the Moos invention, Tr. 590–91, he did not believe that the particular electrode backing structure disclosed in Moos was not a significant step forward. Rather, as noted earlier, *see* text at notes 123–125 *supra*, he considered this to be important advancement. Cairns Tr. 510; plaintiff's exhibit 21, p. 12.

Y.1979); *Schimizzi v. Chrysler Corp., supra,* 462 F.Supp. at 634. Moreover, as noted above, part C(1) *supra,* a prior adjudication upholding validity substantially strengthens the presumption. *Illinois Tool Works, Inc. v. Foster Grant Co., supra,* 547 F.2d at 1303. Thus, at least with respect to the prior art presented to the Patent Office and to the Court of Claims in *Leesona Corp. v. United States, supra,* in connection with the '900 and '909 patents, defendant faces a heightened presumption and a heavy burden. With respect to relevant prior art that was presented neither to the Patent Office nor to the Court of Claims, however, the presumption is weakened or negated altogether. *Julie Research Laboratories, Inc. v. Guideline Instruments, Inc.,* 501 F.2d 1131, 1136 (2d Cir. 1974); *Schimizzi v. Chrysler Corp., supra,* 462 F.Supp. at 635.

1. *Validity of Elmore and Tanner No. 3,419,900*

Defendant offers three arguments in support of its contention that the Elmore and Tanner patent is invalid. First, Varta contends that claim 4 of the '900 patent is invalid under the so-called "late claiming" doctrine. Second, defendant maintains that the claim is invalid under 35 U.S.C. § 102(g) because the invention set forth in claim 4 of the '900 patent was made in the United States by another person before it was disclosed by Elmore and Tanner. Third, Varta asserts that claim 4 is invalid under 35 U.S.C. § 102(b) because of the issuance of foreign patents, which are the counterparts of the '900 patent, that disclosed the device described in claim 4 more than one year before the subject matter of claim 4 was added to the Elmore and Tanner patent application.

**142.** Plaintiff's exhibit 1(c).

**143.** The Court of Claims, addressing this question in *Leesona Corp. v. United States, supra,* 530 F.2d at 901, 208 Ct.Cl. at 879, held that each and every term of claim 4 is supported by, and was plainly disclosed in, the original application filed in 1960. Also from the time the first application was filed, Elmore and Tanner consistently presented claims to a

Although it does not find defendant's three arguments to be as analytically distinct as defendant believes, the Court addresses each of them separately in the following paragraphs. At the outset, however, it is important to point out that each of Varta's contentions raises the critical question whether the original Elmore and Tanner application, filed on March 4, 1960,[142] sufficiently disclosed the subject matter of claim 4 of the '900 patent to permit the claim to have as its effective filing date the date of the original application.[143] If the initial application contained a sufficient disclosure, then none of defendants' arguments can succeed. Moreover, the sufficiency of the disclosure, in this Court's opinion, should be tested against one standard. The test should not depend on the basis on which the patent's validity is being challenged. Defendant does not argue that claim 4 is invalid even if it is accorded a 1960 filing date.

a. *Late Claiming.* Elmore and Tanner's initial application, filed March 4, 1960, was abandoned after none of the claims was allowed in favor of a continuation application filed December 23, 1963.[144] The second application also was abandoned, this one in favor of the continuation-in-part application filed December 22, 1966, on which the '900 patent issued.[145] After unfavorable action by the Patent Office on this last application, Elmore and Tanner amended the application to add, *inter alia,* the claim that became claim 4 of the '900 patent. This last amendment was filed on October 6, 1967.[146]

The initial Elmore and Tanner application disclosed as one object of the invention "a porous electrode, . . . treated with a water repellent substance which does not impede the diffusion of gas through the

new electrode composition consisting of a mixture of fluorocarbon and catalyst particles. In light of these facts, claim 4 is entitled to the filing date of March 4, 1960.

**144.** Plaintiff's exhibit 1(b).

**145.** Plaintiff's exhibit 1(a).

**146.** *Id.,* pp. 49–58.

electrode during cell operation." [147] The application specifically discloses an electrode constructed with a catalytic layer comprising a mixture of PTFE and a metal electrocatalyst,[148] with the PTFE used for its "water and electrolyte repellent properties." [149] Although none of the twenty claims in the original application refers specifically to a fluorocarbon-catalyst *mixture*, as specified in claim 4 of the '900 patent, the claims do refer to the coating of a gas electrode with a fluorocarbon polymer and an electrocatalyst. For example, claim 13 of the first application specified an electrode "coating including a powdered catalyst combined with a powdered substantially inert fluorocarbon." [150] The Court reads the "coating" referred to in these claims, especially in light of subsequent developments in the prosecution of the '900 patent, to describe the coating of an inactive carbon support or extender substrate with a mixture of a fluorocarbon polymer and a metal electrocatalyst, and not to describe the coating of an electrocatalyst material (such as activated carbon) with a fluorocarbon polymer or other wet-proofing material such as disclosed in the Berl patent discussed earlier.[151]

Defendant argues that the subject matter of claim 4 is not essentially the same as that previously claimed in the three Elmore and Tanner patent applications that were filed before the continuation-in-part application was amended in October 1967. A patent may not be obtained for an invention that was on sale more than a year before the patent application was filed. 35 U.S.C. § 102(b).[152] Varta maintains that, because the subject matter of claim 4 is not sufficiently similar to any of the claims in the Elmore and Tanner applications (as amended) prior to the October 1967 amendment for claim 4 to be accorded a filing date earlier than October 1967, the claim is invalid if any device embodying the invention was on sale or in public use prior to October 1966.[153]

Under the late claiming doctrine as it has been applied in the Second Circuit, defendant contends, claim 4 is not entitled to a March 1960 filing date—and thus is invalid if an intervening patenting, published description, sale, or use of the invention there described preceded the date the claim was introduced by more than a year [154]—because it is not "directed to essentially the same subject matter as claims originally presented." *Kahn v. Dynamics Corp. of America*, 367 F.Supp. 63, 72 (S.D.N.Y.1973) (alternate holding), *aff'd*, 508 F.2d 939 (2d Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975). Applying the late claiming doctrine as enunciated by the Supreme

147. Plaintiff's exhibit 1(c), p. 3.

148. *Id.*, pp. 8–9. The application speaks of an "oxygen electrode . . . treated with a metallic silver powder *mixed* with a colloidal Teflon [PTFE] dispersion." *Id.*, p. 9 (emphasis added).

149. *Id.*, p. 10.

150. *Id.*, p. 24.

151. U. S. Patent No. 2,275,281 (1942), defendant's exhibit 34. *See* notes 98 & 112 *supra*.

152. Under 35 U.S.C. § 102(b) a patent may not issue if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

153. Along the same lines, Varta could also argue, though it does not, that claim 4, when added in October 1967, was "new matter" with respect to the continuation-in-part application and thus under 35 U.S.C. § 132 could not be introduced at all. Section 132 provides that "[n]o amendment shall introduce new matter into the disclosure of the invention." In the Court's view, the same test applies to the question whether amended claims constitute "new matter" for § 132 purposes as to the question of the filing date to be accorded claims contained in a continuation-in-part application for late claiming purposes. The prohibition of new matter in § 132 does not apply to continuation-in-part applications because, unlike amendments and continuation applications, by definition continuation-in-part applications add matter not disclosed in earlier applications. But, in the face of intervening art, any "new matter" disclosed in a continuation-in-part application cannot be accorded a filing date earlier than the date of filing of the continuation-in-part application.

154. *See* note 152 *supra*.

Court in *Muncie Gear Works, Inc. v. Outboard, Marine & Manufacturing Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942), the district court in *Kahn* held certain claims invalid because no claims of a "substantially similar scope" to those claims, first presented in the continuation-in-part application on which the patent issued, had been presented to the Patent Office until more than one year after a device substantially the same as the accused device had been on sale in the United States. 367 F.Supp. at 72.[155]

Affirming the lower court on all grounds, the court of appeals in *Kahn* treated the late claiming defense in one paragraph. Citing *Muncie Gear Works, Inc. v. Outboard, Marine & Manufacturing Co., supra*, the court of appeals simply found sufficient evidence to support the district court's determination that the claims were invalid under 35 U.S.C. § 102(b) because "[t]hey were not presented under either the original or the continuation application until more than one year after equipment substantially the same as that charged to infringe had been on sale and delivered to customers." 508 F.2d at 943. Although it accepted the lower court's determination, the court did not explicitly adopt as Second Circuit law the test used below by the district court in deciding that the claims were "not presented" until it was too late for them to be patented over intervening art.

 The decision in *Kahn* on the question of late claiming has not gone unnoticed. It has been criticized in a recent ruling of the Commissioner of Patents and Trademarks, *In re Goldman*, 205 U.S.P.Q. (BNA) 1086, 1089 (1980), and in the patent literature, Ryan, *The Muncie Gear Doctrine and the Effect of Section 132 Upon It*, 62 J.Pat.Off.Soc'y 678 *passim* (1980), and has been questioned in at least one recent decision, *Hercules Inc. v. Exxon Corp.*, 497 F.Supp. 661, 689 (D.Del.1980), as applying the proscription of *Muncie Gear* too broadly. The Court recognizes that the district court opinion in *Kahn* contains language suggesting that, to obtain the earlier reference date, a closer nexus is required in this circuit between newly added claims and the disclosures of the original application than may be required in other circuits. *See, e. g., Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 682 (7th Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978) (claim invalid if the device disclosed "constitutes an impermissible enlargement of the original claims, the basis for which was not disclosed therein"). But in affirming the district court in *Kahn*, the court of appeals did not suggest that the test in this circuit is any different from that followed in other circuits, nor, what is more important, did the court explicitly adopt any test other than that of *Muncie Gear*. Moreover, in the Court's view, the "essentially the same subject matter" test applied by the lower court in *Kahn*, 367 F.Supp. at 72, may properly be applied in this case to determine whether later claims constitute "new matter" for the purposes of both 35 U.S.C. § 132 and the late claiming doctrine.[156]

---

**155.** The district court in *Kahn* also held, earlier in its opinion, that the disclosure was obvious in light of prior art as of the date of the initial application and thus not patentable under 35 U.S.C. § 103. 367 F.Supp. at 67–72. Indeed, the court found that patentee "Kahn made no new contribution to the art, but at most republicized what had much earlier been developed and published by others." *Id.* at 71. As a third alternate basis for its decision, the *Kahn* court held that even if valid Kahn's patent had not been infringed by the accused device. *Id.* at 73–75. Finally, finding the patent "so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity," the district court awarded attorneys' fees to defendant pursuant to 35 U.S.C. § 285. *Id.* at 75–76 (quoting *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 449 (S.D.N.Y.1969), *aff'd*, 421 F.2d 1023 (2d. Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970)).

**156.** In accepting the language of the *Kahn* test as appropriate to a determination whether the subject matter of claim 4, when added to the Elmore and Tanner application, constituted new or late-claimed matter, the Court does not necessarily accept the district court's holding in *Kahn* that matter not specifically claimed earlier but otherwise disclosed in a prior application cannot be claimed in an amendment or continuation application. The Court has reservations about the propriety of this approach, although it is aware that the approach was followed in

Applying the statutory prohibition of what is now 35 U.S.C. § 102(b), the Supreme Court in *Muncie Gear* held to be invalid claims asserted by amendment more than two years after the first public use of the device claimed,[157] because the original patent application and earlier amendments "wholly failed to disclose the invention [later] asserted." 315 U.S. at 768, 62 S.Ct. at 869. Although the court of appeals' affirmance in *Kahn* has been construed to make Second Circuit law to the contrary, *see* Ryan, *supra*, 62 J.Pat.Off.Soc'y at 707–11, this Court believes that *Muncie Gear* only requires it to invalidate claim 4 of the '900 patent if the subject matter added by the claim was new matter, which could be considered to have disclosed a "new invention." *Harries v. Air King Products Co.*, 183 F.2d 158, 160 (2d Cir. 1950).

Defendant contends that claim 4 bears little resemblance to the claims in the original Elmore and Tanner application. While the Court agrees that there are indeed significant differences between claim 4 and the claims as originally presented, the essence of the invention remained the same throughout the prosecution of the patent. Varta correctly notes that the initial application described the impregnating of elec-

trodes with a water- and electrode-repellent fluorocarbon material. But, as the Court observed earlier, the original application described an electrode coating consisting of a fluorocarbon-electrocatalyst mixture[158] —and it is the fluorocarbon-catalyst mixture that is the essence of the Elmore and Tanner invention. As the Court of Claims held in the prior adjudication,[159] the file histories of the '900 patent applications do not require that claim 4 be limited to "fuel cells" operating at a temperature of 100° C or more. Moreover, Varta's further assertion, that claim 4 presents new matter not claimed earlier because it describes a metal electrocatalyst and a gas-consuming electrode, runs completely contrary to the file history of the '900 patent. Even a cursory review of '900 file wrapper reveals that from the beginning Elmore and Tanner claimed a gas-fueled electrode employing a metal-based catalyst.[160]

█ The Court finds that the subject matter of claim 4, when added to the Elmore and Tanner patent application in October 1967, was not new matter with respect to the original 1960 application. The newly added claim contained essentially the same subject matter as the claims of the

---

one other case in this district, *Maclaren v. B–I–W Group Inc.*, 401 F.Supp. 283, 302 (S.D. N.Y.1975), *rev'd on other grounds*, 535 F.2d 1367 (2d Cir.), *cert. denied*, 429 U.S. 1001, 97 S.Ct. at 531, 50 L.Ed.2d 612 (1976). In *Maclaren*, the court construed the rule to provide that a public use of an invention more than one year prior to the time that the invention is specifically claimed renders the claim for the invention invalid, regardless of the fact that the invention may have been disclosed but not formally claimed in the application as originally filed less than one year after the public use.

In view of the Court's application of *Kahn's* test to the *claims* of the original Elmore and Tanner application, it need not reach the question whether claim 4 would be valid if the subject matter had been disclosed in the earlier patent applications but not in the claims themselves.

**157.** *See* note 152 *supra*. During the period relevant to the *Muncie Gear* decision, the statutory period was two years. In 1939 the period was changed to the present one year. *See* 315 U.S. at 766 n.8, 62 S.Ct. at 869 n.8.

**158.** Plaintiff's exhibit 1(c), p. 24 (original claim 13).

**159.** *Leesona Corp. v. United States, supra*, 208 Ct.Cl. at 902, F.F. no. 9(c).

**160.** In original claim 13, for example, Elmore and Tanner describe "fuel ... diffused through" the electrode, plaintiff's exhibit 1(c), p. 24, and earlier in the first application present as one objective of the invention to treat the electrode with a water-repellent substance (such as PTFE) that will not "impede the diffusion of gas through the electrode during cell operation." *Id.*, p. 3. Moreover, from the start Elmore and Tanner conceived only of using a metal electrocatalyst. In the initial application they described "silver, platinum, or palladium powders placed in contact with oxygen or air [as] good electrodes" and as an example of the use of fluorocarbon explained how "metallic silver powder is mixed with a colloidal dispersion of [PTFE]." *Id.*, p. 8. Thus, the "powdered catalyst" referred to in original claim 13 clearly is a metal catalyst. *Id.*, p. 24.

original application. Accordingly, claim 4 is entitled to the benefit of a March 4, 1960, filing date. Therefore, none of the subsequently issued patents, subsequent publications describing the invention, or later-marketed electrodes employing the Elmore and Tanner disclosures is a reference against this claim. Thus, the Court need not determine whether, as defendant contends, Belgian patents numbers 596,662 (issued February 15, 1961), 617,375 (issued August 31, 1962), and 664,187 (issued June 15, 1964) [161] describe the subject matter of claim 4, or whether the electrodes marketed by General Electric and American Cyanamid in 1965 embody the Elmore and Tanner electrode structure.[162]

b. *Prior Invention.* The Court turns next to the second ground on which Varta contends claim 4 of the '900 patent is invalid—that the subject matter of the claim was invented by Oswin earlier than disclosed by Elmore and Tanner and was disclosed in a continuation-in-part application filed by Oswin on March 11, 1966.[163] Under 35 U.S.C. § 102(g), a patent may not issue if the invention claimed was preceded by an invention of the same device in the United States "by another who had not abandoned, suppressed, or concealed it." Moreover, it has been held that a prior invention, over which a patent may not issue under section 102(g), can also be considered prior art that anticipates the claimed invention and renders it obvious under 35 U.S.C. § 103. *In re Bass,* 474 F.2d 1276, 1285–87 (C.C.P.A.1973)

(quoting *Sutter Products Co. v. Pettibone Mulliken Corp.,* 428 F.2d 639, 646 (7th Cir. 1970)).[164]

The Oswin application, though filed six years after the initial Elmore and Tanner application, was filed nine months before the continuation-in-part application on which the '900 patent issued and nineteen months prior to the amendment in which claim 4 was added. Although no patent issued in the United States on the Oswin application, Oswin did secure several foreign patents on the invention.[165] After an unsuccessful prosecution, Oswin abandoned his application. This abandonment, however, was well after the final Elmore and Tanner amendments were filed in October 1967. The language of section 102(g) has been interpreted to make this abandonment irrelevant with respect to the Elmore and Tanner applications, because Oswin did not abandon his application before the '900 patentees asserted their claim. *Allen v. W. H. Brady Co.,* 508 F.2d 64, 67 (7th Cir. 1974). *See also Swift Agricultural Chemicals Corp. v. Farmland Industries, Inc.,* 499 F.Supp. 1295, 1299–1300 (D.Kan.1980), and *Hercules Inc. v. Exxon Corp., supra,* 497 F.Supp. at 668.

The Court agrees with defendant that the Oswin application, as initially filed, discloses a metal-air battery, similar to the Varta cell, that employs in its gas electrode the PTFE-catalyst mixture of Elmore and Tanner as well as the hydrophobic mem-

---

**161.** Defendant's exhibits 291B, 39B and 40B, respectively. All three Belgian patents were issued to General Electric Co. The United States counterparts to these patents are, respectively, No. 3,134,697 (issued to Niedrach & Alford, May 26, 1964), defendant's exhibit 291; No. 3,297,484 (issued to Niedrach, Jan. 10, 1967), defendant's exhibit 39; and No. 3,432,-355 (issued to Niedrach & Alford, Mar. 11, 1969), defendant's exhibit 40.

**162.** *See* Stonehart Tr. 415–16.

**163.** Defendant's exhibit 4 (patent application Serial No. 533,516).

**164.** Section 103 provides that:
 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title,

if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**165.** Belgian Patent No. 675,488 (issued Feb. 15, 1966), defendants' exhibit 27; Spanish Patent No. 321,997 (issued Nov. 1, 1966), defendant's exhibit 427; South African Patent No. 660,118 (issued Oct. 1, 1966), defendant's exhibit 428; and United Kingdom Patents Nos. 1,138,468 and 1,138,469 (both issued Jan. 1, 1969), defendant's exhibits 9 & 10.

brane backing of Moos.[166] Thus, if Oswin is a reference against claim 4 of Elmore and Tanner under 35 U.S.C. § 102(g), the claim is invalid. Because, however, for the reasons stated above, claim 4 is entitled to a March 1960 filing date, the Elmore and Tanner invention has priority over the disclosure in the March 1966 Oswin application, and the latter application therefore may not be used as a reference against the claim either for prior art or obviousness purposes.

■ c. *Foreign Counterparts.* As a third ground on which it contends claim 4 of the '900 patent should be declared invalid, defendant argues that the disclosure of certain species of the Elmore and Tanner invention in foreign patents is a statutory bar under 35 U.S.C. § 102(b) to a broadening of the United States application, more than one year later, to include other species of the same invention, or to include a generic claim covering all species.[167] The Court has no dispute with the proposition, as a matter of law, that "the disclosure of a species in a reference is sufficient to prevent a later application from obtaining generic claims," and that a patentee's own foreign patent can work against him in this regard. *In re Ruscetta,* 255 F.2d 687, 689–90 (C.C.P.A.1958). *See also In re Herschler,* 591 F.2d 693, 696 (C.C.P.A.1979) ("It is now well settled law that disclosure of a species is insufficient to provide descriptive support for a generic or sub-generic claim."). But, for two reasons, this law is of no help to Varta's arguments on the facts of this case.

■ First, the Court finds that the three foreign patents do not, as defendant contends, disclose species of generic claims later asserted by Elmore and Tanner in their United States application.[168] The three patents, quite similar to each other,

closely resemble the original Elmore and Tanner application. Although, as Varta points out, these patents specifically mention only three metal electrocatalysts (silver, platinum, and palladium), the language of the claims does not limit the catalyst at all, but refers only to "a catalyst" generally.[169] Indeed, if anything the foreign patents contain broader claims than their American counterpart.

■ Second, even if the foreign patents do disclose species of broader generic claims that are asserted in the American patent, they are not a reference against claim 4 of the '900 patent, because, as the Court has already determined, claim 4 is entitled to a March 1960 filing date. Only the new matter presented in the Elmore and Tanner continuation-in-part application would be subject to a statutory bar resulting from the foreign patents issued subsequent to the initial American application. *Cf. Chromalloy American Corp. v. Alloy Surfaces Co.,* 339 F.Supp. 859, 874–75 (D.Del.1972) (disclosure of species in British counterpart bar to American patent covering genus).

The Court finds that claim 4 of the '900 patent is valid.

**2.** *Validity of Moos No. 3,276,909*

■ Varta offers one argument in support of its contention that claim 9 of the '909 patent is invalid. Defendant maintains that, if claim 9 of Moos is to be construed as equivalent to an electrochemical cell without a metal catalytic layer, it must be held invalid as reading on prior art. The prior art on which defendant contends claim 9 reads is Belgian patent number 592,862 ("the Belgian '862 patent"),[170] issued to two West German companies on January

---

**166.** Indeed, one of the principal reasons the Oswin application was rejected is that the patent examiner found it unpatentable over Moos under 35 U.S.C. § 103. Defendant's exhibit 4, pp. 28–29.

**167.** *See* note 152 *supra.*

**168.** The three foreign patents are French No. 1,282,491 (issued June 6, 1962), defendant's ex-

hibit 20; West German No. 1,865,941 (issued Jan. 24, 1963), defendant's exhibit 15; and United Kingdom No. 931,959 (issued July 24, 1963), defendant's exhibit 206U.

**169.** *E. g.,* defendant's exhibit 206U, p. 5, claim 11.

**170.** Defendant's exhibit 19.

11, 1961,[171] just four months before the April 6, 1961, filing date of the Moos application. A foreign patent may be used in evaluating the state of prior art under 35 U.S.C. § 103. *Reeves Brothers, Inc. v. U. S. Laminating Corp.*, 417 F.2d 869, 871 n.5 (2d Cir. 1969).

▮ This particular foreign patent was not cited by the patent examiner nor, as far as the Court can ascertain, was it presented to the Court of Claims in *Leesona Corp. v. United States, supra.* Nevertheless, after considering the Belgian '862 patent carefully,[172] the Court finds that it does not render claim 9 of Moos obvious, even when claim 9 is read to be equivalent to an electrode using an activated carbon catalyst.

The Belgian '862 patent discloses an electrode composed of a mixture of carbon powder and a powdery thermoplastic synthetic material.[173] (PTFE is not given as an example of an acceptable thermoplastic material, however.) The patent describes a two-layer electrode structure, one hydrophobic layer of a carbon-polyethylene mixture and a second layer of catalytic material. The carbon-polyethylene layer faces the air, and the catalytic layer is oriented to face the electrolyte. (Moos also discloses a hydrophobic layer facing the gas and a catalytic layer exposed to the electrolyte.)

The Belgian '862 patent, however, does not disclose the use of a hydrophobic film or membrane, but rather a layer comprising a mixture of carbon and hydrophobic polymer material. Moreover, the patent does not describe the use of such polymer-carbon layers to prevent the leaking or weeping of electrolyte from the cell. Instead, the Belgian '862 patent discloses a use of hydrophobic and catalytic materials similar to that described in the Elmore and Tanner '900 patent—that is, the use of these materials to enhance the reactive activity in the active mass of the electrode by allowing for greater diffusion of the reactant gas into the catalytic layer.[174] The patent also discusses the benefits of activated carbon as an electrocatalyst. But, inasmuch as the Belgian '862 patent does not describe the essence of claim 9 of Moos—the use of a gas-permeable hydrophobic polymer membrane to control the electrolyte—the Court finds that this foreign patent is not prior art that renders claim 9 obvious and unpatentable under 35 U.S.C. § 103. Varta has failed to persuade the Court that the '909 patent is invalid. Claim 9 of the '909 patent contains subject matter that is patentable over the Belgian '862 patent.

### F. PATENT MISUSE

▮▮ Attempts to extend the proper scope of the monopoly granted by the issuance of a patent are unlawful. Where a patent holder misuses a patent by attempting to extend the lawful monopoly, a court

---

171. The Court is not entirely certain on what date the Belgian '862 invention was "patented" in Belgium, but apparently it was made available to the public on January 11, 1961. In any event, the precise patenting date is not critical to the determination here of obviousness under 35 U.S.C. § 103, though it would be if the issue were one of statutory bar under 35 U.S.C. § 102(b). *Cf. In re Bo Thuresson Af Ekenstam*, 256 F.2d 321 (C.C.P.A.1958) (question of Belgian patenting date for § 102 purposes).

172. The patent was initially received in evidence for a limited purpose not having to do with prior art. Tr. 461. Later, however, during closing argument, plaintiff withdrew its earlier objection, Tr. 926, and the Court now considers defendant's exhibits 19 and 19A, the Belgian '862 patent and its English translation, to have been received for all purposes.
Although the Court has reviewed the Belgian '862 patent as prior art with respect to

Moos, it has done so without the aid of testimony, expert or otherwise. Defendant seeks to persuade the Court that the patent renders claim 9 of Moos obvious (if the claim is read to cover an activated carbon catalyst), but Varta never saw fit to explain through testimony how the Belgian patent does so. Nor, what is more important, defendant did not put plaintiff on notice that it was planning to use the Belgian '862 patent in this way, and thus plaintiff adduced no testimony in opposition to defendant's contention that the patent is prior art with respect to Moos.

173. Defendant's exhibit 19A, p. 5.

174. Having a publication date after the March 1960 filing date accorded to claim 4 of the '900 patent, however, the Belgian '862 patent cannot be a reference against Elmore and Tanner.

as a matter of equity "may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement." *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 493, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942). Thus, an otherwise valid patent may not be enforced against an infringer as long as the misuses of the patent continue. *Id.*

For the defense of patent misuse to apply, the inequitable conduct must involve the patents in suit. *Riker Laboratories, Inc. v. Gist-Brocades N. V.*, 636 F.2d 772, 777 (D.C.Cir.1980). Although it has been held that the party who asserts the patent-misuse defense must be injured as a result of the misuse, *id.; McCullough Tool Co. v. Well Surveys, Inc.*, 395 F.2d 230, 238 (10th Cir.), *cert. denied*, 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261 (1968), the Supreme Court in *Morton Salt Co. v. G. S. Suppiger Co., supra*, explicitly held to the contrary. In *Morton Salt* the Court wrote: "It is the adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct, which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent." 314 U.S. at 494, 62 S.Ct. at 406. Neither side has suggested to the Court that, at least in this respect, *Morton Salt* is no longer good law. Accordingly, for Varta to assert a successful defense based on patent misuse it need not demonstrate that it was a particular victim of any inequitable conduct by Leesona.

Varta contends that two aspects of the Leesona-Gould license agreement covering the '900 and '909 patents demonstrate patent misuse. First, defendant maintains that it is misuse for Leesona to require that licensee Gould pay a fixed royalty fee of five percent of the "net selling price" of any metal-air battery that contains a component covered by one or more claims of the licensed patents.[175] Second, defendant as-serts that it is also misuse for the license agreement to extend to September 30, 1985, at the same five percent royalty, unless both the '900 and '909 patents have expired or been declared invalid before that date.[176]

The Court finds no evidence in the record to support the first ground on which Varta bases its patent-misuse defense. Although a patentee may not use the patent monopoly to obtain royalty payments on unpatented products, it is not patent misuse *per se* for a multi-patent licensing agreement to base royalties on the sale of all products using any of the inventions covered by the patents. Such an agreement is perfectly acceptable so long as the arrangement is designed to serve the parties' mutual convenience. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 138, 89 S.Ct. 1562, 1584, 23 L.Ed.2d 129 (1969). Patent misuse results when the patent holder conditions a license covering one patent on the payment of royalties on the sale of products employing other unwanted patents or products employing none of the patent·holder's patents at all. *Id.* at 136, 89 S.Ct. at 1583. To determine if there was such "conditioning," *id.* at 138, 89 S.Ct. at 1584, the Court must look to see whether the license condition was the result of good-faith bargaining between the parties or was imposed on the licensee by the patent holder and whether the licensee raised objections that were overridden by the licensor. *Glen Mfg. Inc. v. Perfect Fit Industries, Inc.*, 420 F.2d 319, 321 (2d Cir.), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970).

Having reviewed the evidence introduced at trial through exhibits and testimony by oral deposition,[177] the Court finds no evidence that the five percent royalty rate, applicable to the sale of any product using either the '900 or the '909 patent, was fixed for purposes other than the convenience of the parties. Although at one point Gould apparently sought the assign-

---

**175.** Defendant's exhibit 208 (Leesona-Gould license agreement), art. III, § 1, at p. 8.

**176.** *Id.*, art. V, § 1, at pp. 14–15.

**177.** No witnesses testified at trial in support of Varta's defense of patent misuse.

ment of individual royalty rates to each of the patents licensed,[178] there is no suggestion that Leesona rejected such an assignment over protestation from Gould and demanded the flat five percent rate as a condition of any license agreement. Indeed, the evidence is to the contrary.[179] Moreover, the evidence further reveals that Gould never requested from Leesona the option of licensing fewer than all of the patents contained in the agreement.[180]

■ A patent holder cannot use the grant of a license as means of extending the lawful term of the patent monopoly. A "patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*." *Brulotte v. Thys Co.*, 379 U.S. 29, 32, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964). The use of such an arrangement constitutes patent misuse even in the absence of evidence demonstrating that the patent holder used the leverage of the patent coercively to impose an ex-

tended term on the licensee. *Veltman v. Norton Simon, Inc.*, 425 F.Supp. 774, 775 (S.D.N.Y.1977).

■ Here, however, the license agreement extends to September 30, 1985, or the date on which both the '900 and the '909 patents are no longer in effect, whichever is sooner. Thus, the agreement does not extend beyond any term granted by the patent monopoly and therefore is not evidence of patent misuse *per se*. Moreover, the extension of the five percent royalty rate to the later-remaining patent is no more evidence of patent misuse, absent "conditioning" or coercion, than the payment of such a royalty on the sale of a product employing one but not both of the patents while both patents remain in force.

■ The Court therefore concludes that plaintiff has not misused the '900 and '909 patents and thus is not precluded from enforcing the patents in this action.[181]

---

**178.** Defendant's exhibit 233 (Gould draft of proposed terms of new Gould-Leesona license agreement), p. 10.

**179.** Hipp deposition, vol. III, p. 216. Regarding the assignment of royalty rates to individual patents, Hipp, a patent lawyer at Gould, recalled, "I don't think that anybody pushed any position with any strong feeling one way or the other. And I think in the end, Gould just—they accepted the clause as it is presently written. I don't think there was any protracted negotiations on that subject." *Id.*

**180.** Hipp recalled that Gould wanted licenses on all of the patents contained in the agreement. *Id.*, p. 215.

**181.** As an additional defense to plaintiff's enforcement of claim 4 of the '900 patent, defendant contends that the claim is invalid because patentees Elmore and Tanner failed to disclose to the Patent Office that foreign patents had issued on patentees' invention. *See* part E(1)(c) *supra*. The Court does not question Varta's assertion that the fraudulent procurement of a patent may render it invalid, *see, e. g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965); *Chromalloy America Corp. v. Alloy Surfaces Co., supra*, 339 F.Supp. at 874–76, and that patent applicants have a duty to behave candidly and in good faith in their dealings with the Patent Office. 37 C.F.R. § 1.56(a) (1980); Manual of Patent Examining Procedure § 2001

(rev. 4th ed. Oct. 1980). *See also SCM Corp. v. Radio Corp. of America*, 318 F.Supp. 433, 449–50 (S.D.N.Y.1970) (declining for equitable reasons to enforce patent because patentee intentionally made misrepresentations to Patent Office, even though the misrepresentations were not material). But the Court finds the evidence in the record insufficient to support Varta's contentions.

As required by 37 C.F.R. § 1.65 (1980), Elmore filed an affidavit with the 1966 continuation-in-part application setting forth that four foreign patent applications had been filed on March 3, 1961. Plaintiff's exhibit 1(c), pp. 26–27 (affidavit sworn to Nov. 8, 1966). The patentees, however, did not disclose to the Patent Office that patents on three of the foreign applications had issued prior to the date the continuation-in-part application was filed. *See* note 168 *supra*. Nevertheless, for the reasons set forth in part E(1)(c) *supra*, the Court does not find that the failure to disclose the issuance of these patents was material to the Patent Office's determination on claim 4 of the '900 patent. Moreover, although the Court finds it somewhat curious that the patentees failed to mention the issuance of these three foreign patents in their continuation-in-part application, it is not persuaded by the evidence presented that Elmore and Tanner intentionally misled the Patent Office, acted in bad faith, or otherwise engaged in the type of inequitable conduct that would impel this Court, in the exercise of its equitable powers, to decline to enforce the '900 patent.

## CONCLUSION

Accordingly, the Court finds that claim 4 of the '900 patent and claim 9 of the '909 patent are valid and infringed by the Varta button-cell hearing-aid battery.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

The parties are directed to advise the Court within thirty (30) days of the date of this decision how they propose to proceed with the severed claims, including plaintiff's claim for damages.

Settle judgment on notice.